IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

**F I L E D**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

OCT 10 2001

DAVID J. MALAND, CLERK
BY
DEPUTY

| | § | |
| --- | --- | --- |
| TRITON ENERGY LIMITED | § | Civil Action No. 5-98-CV-256 |
| | § | |
| SECURITIES LITIGATION | § | (Jury Trial Demanded) |

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' OPPOSED SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION

NOW COME LEAD PLAINTIFFS, Individually and on behalf of all others similarly situated, and respectfully submit this their Reply to Defendants' Response to Plaintiffs' Supplemental Motion for Class Certification, pursuant to FED. R. CIV. P. 23 and, in support therefore, would show this Honorable Court as follows:

### I. INTRODUCTION

As set forth in Plaintiffs' Supplemental Motion, there is no impediment to certification of the proposed Class under Federal Rules of Civil Procedure 23(a) or 23(b)(3). Knowing this fact to be true, Defendants have conceded that Plaintiffs have presented sufficient factual and legal support to satisfy the numerosity and commonality elements of Rule 23(a)(1-2) and the superiority element of Rule 23(b)(3). Defendants also have failed to make any legitimate attempt at challenging the typicality element of Rule 23(a) or the predominance element of Rule 23(b)(3). Instead, Defendants have opted to put all of their eggs in one basket by challenging the adequacy of the proposed Class Representatives under Rule 23(a)(4) and *Compaq v. Berger*. Unfortunately for Defendants, their eggs are all rotten and their basket is full of holes. Or, in less metaphoric terms, their opposition to certification is without merit.

In their desperate attempt to avoid certification, Defendants attempt to create a new requirement under Rule 23(a)(4)—the "Super Hero Plaintiff" requirement. Under Defendants' skewed interpretation of the law, it is not enough for class representatives, like Plaintiffs here, to



(1) be informed about the litigation, (2) be able and willing to prosecute their claims on behalf of the Class, (3) be part of a cohesive group effort to bring unlawful Defendants' to justice for the benefit of all similarly situated injured investors, (4) take an active, involved, and informed role in the prosecution of the litigation, (5) control the litigation on behalf of the proposed Class, (6) provide counsel with information regarding the claims at issue, (7) unselfishly give up as much of their personal time and resources as needed to prosecute their claims on behalf of all Class Members, and (8) fulfill every duty and requirement imposed by the PSLRA and Rule 23. Defendants would instead have this Court rule any proposed class representative inadequate unless he has a law degree, has the ability to conduct discovery on his own even when the mandatory PSLRA discovery stay is in effect and defendants repeatedly attempt to stonewall discovery, is willing to waive the attorney client and attorney work product privileges, and possesses super human powers that only exist in comic books and fairy tales.

In reality, however, neither the Federal Rules of Civil Procedure, the PSLRA, nor *Compaq v. Berger* impose such requirements. Rather, a class representative need only be informed or understand the litigation and ready, able and willing to control the litigation at hand; he need not be a legal scholar. The proposed Class and Class Representatives easily meet these requirements and every other requirement of Rules 23(a) and 23(b)(3). Accordingly, Plaintiffs respectfully request that the Court certify the proposed Class and allow this case to proceed toward trial.

## II.    DEFENDANTS CONCEDE VIRTUALLY EVERY ELEMENT OF RULES 23(A) AND 23(B)(3)

Defendants concede that Plaintiffs' proof and arguments in support of class certification meet the requirements of virtually every element of Rules 23(a) and 23(b)(3). Before doing so, however, Defendants claim that Plaintiffs have attempted to "shift" the burden to Defendants to demonstrate that class certification is not appropriate. Defendants' argument is patently false.

Plaintiffs do not attempt to "shift" any burden to Defendants.  Plaintiffs recognize that they have the burden to adduce evidence and legal support to establish that certification is appropriate in this case.  Contrary to Defendants' argument, however, this burden is not a heavy one.  Moreover, once Plaintiffs meet this burden, certification is required unless Defendants come forward with sufficient evidence to demonstrate that certification is not proper.  This allocation of burdens is nothing new; it is simply black letter law.   Moreover, neither *Castano* nor *Compaq* change this burden or allow the Court to make any determination as to the merits of Plaintiffs' claims.

Here, Plaintiffs have produced proof sufficient to establish every element required by Rules 23(a) and 23(b)(3).  Plaintiffs meet this burden under even the most "rigorous analysis." Therefore, Defendants have conceded that Plaintiffs' proof and arguments are sufficient to satisfy the requirements of Rule 23(a)(1) and (a)(2) and the superiority/manageability element of Rule (b)(3).  As such, the Court must find in Plaintiffs' favor on each of these elements.

## A.      Defendants Concede Numerosity

Plaintiffs' proof and arguments in favor of certification satisfy the numerosity requirement of Rule 23(a)(1).  Therefore, Defendants concede this element.  Accordingly, the Court should find the Class "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

## B.      Defendants Concede Commonality

Plaintiffs' proof and arguments in favor of certification satisfy the commonality requirement of Rule 23(a).  Therefore, Defendants concede this element as well.  Accordingly, the Court should find that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2).

**C.   DEFENDANTS CONCEDE THAT CLASS COUNSEL WILL ADEQUATELY REPRESENT THE CLASS**

Defendants neither can nor do attempt to challenge Plaintiffs' proof and arguments that Class Counsel will adequately represent the interests of Plaintiffs and absent Class Members. Instead, Defendants also concede this element of Rule 23(a)(4).[1] Accordingly, the Court should find that Class Counsel "will fairly and adequately represent the interests of the class." FED. R. CIV. P. (a)(4).

**D.   DEFENDANTS CONCEDE THE SUPERIORITY/MANAGEABILITY ELEMENT OF RULE 23(B)(3)**

Defendants also cannot challenge Plaintiffs' proposed trial plan or proof and arguments that a class action is a superior and manageable mechanism to litigate the claims at issue in this litigation. Instead, Defendants also concede this element of Rule 23(b)(3). Therefore, the Court should find that allowing this case to proceed as "a class action [is] superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).

### III. DEFENDANTS CHALLENGES ON THE GROUNDS OF TYPICALITY, ADEQUACY, AND PREDOMINANCE ARE BASELESS

Defendants only challenge certification on three grounds: typicality, predominance, and adequacy of representation. As will be demonstrated below, Defendants' arguments against certification are baseless.

---

[1] In one of their many blatant attempts to mischaracterize the facts in this case, Defendants claim that Plaintiffs have requested the Court to appoint the Patton Haltom firm as additional Class Counsel. Defs.' Resp. at 9 n.7. This is false. Plaintiffs specifically state in their Supplemental Motion that they seek appointment of Milberg, Weiss and Nix, Patterson & Roach as Class Counsel. Plfs.' Supp. Mot. at pp. 1, 20. While Plaintiffs certainly believe the Patton Haltom firm is worthy of such an appointment, and have submitted affidavits from the four firms that are handling the prosecution of this case with Lead Plaintiffs, including Patton Haltom, to provide further evidence of the adequacy of all of Lead Plaintiffs' attorneys, Defendants' claim in this regard is completely false.

## A.     The Claims of Class Representatives are Typical

Class Representatives' claims are typical of the claims of all unnamed Class Members. Defendants nevertheless challenge the appointment of certain Lead Plaintiffs as Class Representatives on the basis of typicality.  Specifically, Defendants allege that certain Lead Plaintiffs are subject to the following "unique defenses" that render their claims "atypical:" (1) Terril and McDonald lack standing; (2) Lee, Ingram, and McDonald actually profited from their purchase of Triton common stock; (3) Sevilla and Ingram are subject to a defense based upon spoliation of evidence; (4) McDonald, Ingram, and Terril may lack "credibility;" and (5) certain other Lead Plaintiffs may not be entitled to a presumption of reliance under the fraud on the market doctrine.  These are the exact "unique defense" arguments Lead Plaintiffs predicted (in their Supplemental Motion) Defendants would raise.   And, just as Lead Plaintiffs discussed in their Supplemental Motion, virtually every court to address these "unique defenses" has rejected them as an impediment to a finding of typicality.  The present case is no different.

As a threshold matter, it should be noted that Defendants' proposed "expert" on class certification under the PSLRA has not challenged the presence of typicality in this case. Plaintiffs' expert, Professor Geoffrey Miller, clearly opined that, in his expert opinion as a long-time professor and practicioner of class actions under the PSLRA, the claims of Lead Plaintiffs are typical of the claims of the proposed Class.  *See* Miller Report.  Defendants' proposed expert does not even attempt to rebut or challenge this opinion.  The reason for this failure is simple: there is no credible basis to challenge typicality.  Nevertheless, as is their custom, Defendants ignore the obvious and attempt to resurrect a baseless and futile defense.

Defendants initially challenge typicality by making a conclusory statement that "grounds exist for challenging the presumption of reliance [under the fraud on the market doctrine] as to

many of the remaining Plaintiffs." Defs.' Resp. at 32.  Specifically, Defendants argue that the presumption of reliance is rebutted by *"any showing* that severs the link between the alleged misrepresentation and either (i) the price received (or paid) by the plaintiff *or* (ii) the investor's decision to trade at a fair market price." *Id.*  This argument is incorrect and irrelevant to the issue of certification.

In their Supplemental Motion, Plaintiffs discussed the fraud on the market doctrine at length.  As Plaintiffs demonstrated, the United States Supreme Court clearly has held that the fraud on the market doctrine relieves plaintiffs of the burden of proving individual reliance in a class action under the PSLRA.  Two weeks ago, the Fifth Circuit addressed the fraud on the market doctrine under the PSLRA in *Nathenson v. Zonagen, Inc.*, No. 99-20449, (5th Cir. September 25, 2001), slip opinion.  In *Zonagen,* the Fifth Circuit reaffirmed that the fraud on the market doctrine is the law in the Fifth Circuit, and that it entitles PSLRA plaintiffs to a presumption of reliance if the stock at issue traded on an efficient market.  *Id.* at pp. 25-37.  This doctrine eliminates the need for a plaintiff (or any unnamed class member) to establish direct reliance upon any specific act and/or omission.  Instead, the focus is exclusively upon the inflationary effect on the stock price caused by the acts and/or omissions at issue.  *Id.*

This is the exact rule of law asserted by Plaintiffs in their Supplemental Motion.  It is beyond question that Plaintiffs are entitled to a presumption of reliance under this doctrine. Plaintiffs assert the fraud on the market doctrine in their Consolidated Complaint.  Plaintiffs allege that Triton common stock traded on an efficient market.  Plaintiffs allege that Defendants' acts and/or omissions artificially inflated the market price of such stock.  And, Plaintiffs have provided expert testimony from economist Blaine Nye that Triton common stock traded on an efficient market during the Class Period.  Defendants have failed to come forward with any

argument, evidence or expert testimony to rebut Plaintiffs' allegations and evidence. Therefore, Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine set forth in *Basic* and reaffirmed in *Zonagen*.

Defendants nevertheless raise "unique defense" arguments regarding the timing of Plaintiffs' purchases, their trading strategies and sophistication, and alleged receipt of "inside information." These arguments, even if true (which they are not), have no bearing whatsoever on the issue of typicality. In their Supplemental Motion, Plaintiffs cited and discussed numerous cases that uniformly hold that typicality is not affected by what a plaintiff reviews prior to purchasing stock or the sources of that information, differences in the amount of damages, dates, size, or manner of purchases, the type of purchaser. In and out trading, averaging down, and even the specific document influencing the purchase in fraud on the market cases because investors who buy or sell stock at a price set by the market do so in reliance on the integrity of that price. *See, e.g., Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y. 1981); *Accord Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir. 1985); *Kennedy,* 710 F.2d at 727. This is the whole point of the fraud on the market doctrine.

Four weeks ago, the United States District Court for the District of Minnesota added to the overwhelming body of law supporting a finding of typicality in the face of the same shop-worn "unique defense" arguments Defendants assert here, in *In Re Select Comfort Corp. Securities Litigation,* Civil No. 99-884 (D. Minn. September 5, 2001), slip opinion.[2] Not surprisingly, Defendants fail to refer the Court to *Select Comfort* in their Response brief.

---

[2] Plaintiffs have attached a copy of the *Select Comfort* decision for the Court's review and convenience as Exhibit A.

In *Select Comfort*, the defendants asserted "unique defenses" related to the timing of the proposed class representatives purchases, varying trading strategies and sophistication. The district court quickly rejected these "unique defense" arguments. The court held that "the existence of potential defenses unique to a named plaintiff does not automatically preclude a finding of typicality." *Id.* at 20 (citing *Gazpar v. Linvatec Corp.*, 167 F.R.D. 51, 58 (N.D. Ill. 1996) (holding that unique defenses are insufficient to defeat typicality where they are not likely to consume the entire case) and *ABT v. Mazda Am. Credit*, No. 98-C-2931, 1999 WL 350738, at *3 (N.D. Ill. May 19, 1999) (holding that Rule 23(a)(3) requires typical claims, not typical defenses, and, therefore, existence of unique defenses does not defeat a finding of typicality)). Instead, the court ruled that a representative may satisfy the typicality requirement even though he may later be barred from recovery by a "defense particular to him that would not impact other class members." *Id.* at 19 (citing *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200-01 (S.D.N.Y. 1992)).

The court further held that:

> Courts routinely certify a class with representatives who purchased stock during and after a class period. In fact, purchasing stock subsequent to a materially adverse disclosure, 'averaging down,' is a common technique used to decrease the average cost of an investment and which cannot be used to defeat . . . typicality.

*Id.* at 19 n.12 (citing *In re Adobe Sys. Inc. Sec. Litig.*, 139 F.R.d. 150, 155 (N.D. Cal. 1991) (holding that even if a plaintiff knows about a misrepresentation subsequent to the class period, but prior to his purchase of stock, the presumption of reliance is not rebutted)). The court also held that "unique defense" arguments regarding representatives who may have used varying strategies such as "in-and-out trading" and "short selling," or who had "divergent motivations and trading strategies" may affect the assessment of individual damages but have no affect

whatsoever upon a finding of typicality. *Id.* Quite the contrary, typicality is present wherever the allegations support a finding that the proposed representative, "like all other class members, allegedly overpaid because the stock price was artificially inflated due to defendants' purportedly misleading statements." *Id.* at 20.

Therefore, *Select Comfort*—just like the numerous cases previously cited by Plaintiffs—conclusively rejects the same "unique defense" arguments raised by Defendants here. It is beyond dispute that the named Plaintiffs' claims are typical of the putative class' claims. *See* Miller Report. Lead Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market doctrine because there was an efficient market for Triton common stock during the Class Period and they purchased shares during such period. *See* Nye Report; Miller Report. Thus, Lead Plaintiffs stand in the same position as the other Class Members. The proof Plaintiffs will offer, the legal theories they have advanced, and the common course of Defendants' acts and/or omissions are basic to the claims of all Class Members. Accordingly, the relative sophistication or investment strategy of a plaintiff, the timing of his purchases, and even the actual information upon which he acted in a fraud-on-the-market action such as this simply are completely irrelevant to the issue of certification.

Moreover, even if these "unique defense" arguments were relevant to the issue of certification, which they are not, Defendants' arguments nevertheless must fail.

Defendants first argue that the claims of Plaintiffs D.H. Lee and Kelly McDonald are not typical because they purchased some additional shares after the Class Period. Defendants neither do nor can argue that these Plaintiffs did not purchase shares of Triton common stock during the Class Period. As demonstrated above, the fact that these Plaintiffs may have purchased some additional shares after the Class Period has nothing to do with certification. In fact, the cases are

uniform in holding that evidence of such purchases ("averaging down") can never defeat a finding of typicality.

Defendants next argue that Lead Plaintiff Terril is atypical because he (1) was a sophisticated investor, (2) ranked Triton as a risky investment, (3) did not accept reports he heard about Triton, (4) knew that the Company might not be sold at the end of the process and (5) compared Triton to other oil and gas companies. All of these arguments are without merit.

First, as set forth above and in the Supplemental Motion, the case law is decisive in holding that whether one is a sophisticated investor is irrelevant to whether he can be a class representative. Indeed, the PSLRA actually encourages courts to allow institutional investors and large investors to act as lead plaintiffs. Certainly, an institutional investor would possess more "sophistication" in securities trading than the average investor.

Second, while Terril may have ranked the Triton investment as risky (as are most stocks), at no time did he believe that Defendants were actually lying to him. If he did, why would he ever have bought the stock? *See, e.g., Basic*, 485 U.S. at 246-47 (stating that "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?"). Third, Terril testified in his deposition that he believed Triton's reports and the analysts who spoke to Triton and that this formed the basis for his purchases of Triton stock. *See* Terril Tr. at 79, 97-100, 110-13, 201. Fourth, even assuming the existence of a possibility that the Company might not be sold at the end of the process, as Terril testified, the Company mislead him as to the likelihood of a sale and the value of its assets. *Id.* at 119-120, 79 ("The management was trying to give everyone the impression that it could be worth \$50, \$60 per share"); *Id.* at 113 ("management had released a report . . . [that] there was tremendous bidding interest and the prices were in line with what they were

hoping for."). Finally, there is no significance to the fact that Terril compared Triton with other oil and gas companies. Plaintiffs do not accuse other oil and gas companies of fraud—they accuse only <u>Triton</u> of fraud.

Defendants also argue that Terrill has no standing to maintain this lawsuit. Defendants once again are wrong. Contrary to Defendants' arguments, Terril Brothers is a "real party in interest" in this litigation. It is black-letter law that only purchasers and sellers of securities are entitled to sue under Section 10(b) and Rule 10b-5. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 (1975); *United States v. O'Hagan*, 521 U.S. 642, 660 (1997). Because all of the Triton securities purchases and sales here were in the name of Terril Brothers, it is Terril Brothers, not its clients, who was a "purchaser" of Triton securities within the meaning of § 10(b). Only after the purchases were made were the Triton shares allocated to the Terril Brothers clients' accounts. *See* Terril Aff. ¶ 4[3]. Further, Mr. Terril—and *only* Mr. Terril—made the investment decisions to purchase Triton shares. Terril Aff. ¶ 3. Therefore, Terril Brothers has standing to bring this action in its own name, pursuant to the federal securities laws.[4]

Further, even if the Triton purchases here were not made in the name of Terril Brothers, the law is clear that an investment advisor who has decision-making authority over a securities account not in its name has standing to sue as a "purchaser." *See Monetary Management Group,*

---

[3]John Terril previously submitted an affidavit in connection with a discovery dispute in this case. A true and correct copy of this affidavit is attached for the Court's convenience as Exhibit B.

[4]There have been many instances where investment advisors have been appointed as lead plaintiffs under the PSLRA *See, e.g., Local 144 Nursing Home Pension Fund v. Honeywell International, Inc.,* 2000 U.S. Dist. LEXIS 16712, at *14 (D.N.J. Nov. 16, 2000) (financial advisors Congress Asset Management and Boston Research & Management appointed with others to serve as lead plaintiff); *In re Party City Sec. Litig.,* 189 F.R.D. 91, 111 (D.N.J. 1999) (group consisting of Slater Asset Management, LLC and others appointed as lead plaintiffs); *In re Milestone Scientific Sec. Litig.,* 183 F.R.D. 404, 418 (D.N.J. 1988) (Gintel Asset Management, Inc. and others selected to serve as lead plaintiffs); *In re Sunbeam Sec. Litig.,* 1998 U.S. Dist. LEXIS 21490, at *10 (S.D. Fla. Dec. 7, 1998) (Smith Asset Management); *Takeda v. Turbodyne Technologies, Inc.,* 67 F. Supp.2d 1129, 1136 (C.D. Cal. 1999).

**Lead Plaintiffs' Reply to Defendants' Response to Lead Plaintiffs' Opposed Supplemental Motion for Class Certification**
*In Re: Triton Energy Limited Securities Litigation*

*Inc. v. Kidder, Peabody & Co.,* 604 F. Supp. 764, 766 (E.D. Mo. 1985) (an investment advisor was a "real party interest" for purposes of prosecuting a securities action); *Odette v. Shearson, Hammill & Co.*, 394 F. Supp. 946, 959 (S.D.N.Y. 1975) ("broker who purchases or sells as agent for his customer satisfies the purchaser-seller requirement" (citation omitted)).  Moreover, Mr. Terril has advised all of his current and former clients of the litigation and his role as a representative in the litigation and has the express authority to act on behalf of all of his clients on whose behalf he purchased Triton shares.  These clients do not intend to bring their own individual actions.  Terril Aff. at ¶¶ 5-6 ("I have spoken to each of my clients who had shares of Triton stock allocated to them during the Class Period and have advised them of the above-captioned litigation and Terril Brothers' role as a Lead Plaintiff and proposed class representative;" "[e]ach of these clients have authorized me (through Terril Brothers) to act on their behalf with respect to this litigation and are not seeking to maintain actions against Triton other than through this litigation.").  Further, despite Defendants' hollow arguments, if a recovery is achieved in this case either through judgment or a settlement, any monies would be allocated to Terril Brothers' clients, by Mr. Terril, as determined by the Court and/or the claims administrative process.  Terril Aff. at ¶ 7.  Therefore, any typicality challenge to Terril based upon standing is futile at best.

Defendants next accuse Plaintiff Whiddon of being atypical because he purchased put options during the Class Period which, according to Defendants, indicates that he did not believe that Triton would maintain its price.  Defendants arguments are factually and legally deficient. Whiddon purchased his Triton shares because he had heard information about the Company relating to its value, its assets, the auction of the Company and Defendants' expectation of a good return.  Whiddon Tr. at 71.   During the Class Period, in addition to purchasing Triton

stock, Whiddon also purchased Triton call options.  According to Whiddon, he bought call options when he was fairly confident that the calls would be profitable, *i.e.,* that the stock was going to increase in price. *Id.* at 55.  In the case of Triton, Whiddon believed that Triton's stock price would increase because of the statements made by the Defendants. *Id.* at 79.  Whiddon only bought put options on July 15, 1998, two days before the end of the class period, because Triton's stock price was falling. *Id.* at 88, 89-90.  According to Whiddon, "[Triton] stock didn't act like [Defendants'] statements were true.  The value did not appear to be there."  Whiddon Tr. at 89-90.  Therefore, because Whiddon had a sizeable investment in Triton call options, he acted to "hedge" his position "so that I wouldn't have a horrendous loss if, indeed, the auction and the statements . . . didn't turn out as we were told it would." *Id.* at 90.  As set forth above, and discussed at length in Plaintiffs' Supplemental Motion, and by the court in *Select Comfort* this investment strategy of "hedging," or "averaging down," is common and courts have routinely held as a matter of law that use of these investment strategies cannot render a shareholder atypical.

Defendants next argue that Plaintiff McDonald has no standing because the Triton stock he is suing on was actually owned in a separate entity–CJ Investments.  Defendants are wrong.  CJ Investments was a closely-held corporation of which McDonald, his mother and his father were the sole shareholders and officers.  McDonald Tr. at 15-18.  CJ Investments is now dissolved. *Id.* at 18.  CJ Investments held only the Triton shares, some properties and a small business. *Id.* at 19.  The money used to purchase the Triton shares was primarily McDonald's. *Id.* at 21, 109 (the money used to purchase these shares was obtained by McDonald selling his sports bar).  The Triton investment decisions were made by McDonald and any recovery in this

action will go to McDonald. *Id.* at 21.  Therefore, McDonald is clearly the beneficiary and successor-in-interest of CJ Investments and has standing to maintain this action.

Defendants next claim that Plaintiff McDonald is subject to "unique defenses" because he may have relied upon "inside" information regarding Triton in purchasing some Triton shares during the Class Period.  Triton argues that McDonald relied upon inside information because he had an uncle, "Pat", who worked for Triton. This claim is a red herring.  During his deposition, McDonald readily admitted that his uncle worked for Triton.  McDonald Tr. at 172. McDonald testified that he did not know what position his uncle had with Triton, that he never spoke to his uncle about Triton, and that he once received an e-mail from his uncle which contained "general information that the company was a good solid company." *Id.* at 172-173.  Otherwise, McDonald never spoke to his uncle during the time McDonald invested in Triton. *Id.* at 174.  In fact, the last time McDonald saw his uncle in person was prior to his investing in Triton. *Id.* at 174.  Thus, there is no evidence whatsoever that McDonald engaged in "insider trading" of any type or that he relied upon any such information in purchasing Triton stock.

Quite the contrary, McDonald testified that he relied solely upon public information disseminated by Defendants through their public filings, analysts, brokers, and their Investor Relations Department. *Id.*  The only "inside information" McDonald relied upon was the repeated material omissions and misstatements of fact disseminated by Defendants and their Investor Relations Department.  Because McDonald relied on communications he had with Triton's Investor Relations department and other public information, he clearly relied on the integrity of the market when he bought his stock.  Thus, like all Lead Plaintiffs, he is entitled to a presumption of reliance under the fraud on the market doctrine.

Therefore, as set forth above and in Plaintiffs' Supplemental Motion, each proposed Class Representative meets the typicality requirement and is entitled to a presumption of reliance under the fraud on the market doctrine. Each and every "unique defense" argument raised by Defendants to challenge typicality has been rejected time and time again by the courts as a matter of law. In addition to being legally insufficient to defeat typicality, Defendants' "unique defense" arguments are factually insufficient as well. As such, there simply is no impediment to a finding of typicality in this case.

**B.    Common Issues Predominate**

Common issues predominate in this case. Defendants all but concede this issue. Indeed, like typicality, Defendants' proposed "expert" on class certification has not challenged the presence of predominance in this case. Defendants have done nothing more than make a five sentence conclusory claim that predominance is absent in this case. The reason for this half-hearted challenge is simple: there is no credible basis to challenge predominance.

Common questions predominate here because the acts and/or omissions at issue in this case constitute a common course of conduct directed toward the investing public. These acts and/or omissions artificially inflated the price of Triton common stock during the Class Period. Under the fraud on the market doctrine all Class Members are deemed to have relied upon Defendants' common course of conduct and its effect upon the market price of Triton common stock. Thus, this case presents the protype class action where common issues predominate. *See* Miller Report; *see also Amchem*, 117 S. Ct. at 2250 (holding that *"[p]redominance is a test readily met in . . . cases alleging . . . securities fraud."* (citations omitted, emphasis added)).

In addition to the numerous cases set forth in Plaintiffs' Supplemental Motion, which support a finding of predominance here, the court rejected a virtually identical predominance

challenge in *Select Comfort.* As previously discussed, the defendants in *Select Comfort* raised identical "unique defense" arguments to typicality as those asserted by Defendants here and claimed that the presence of these "unique defenses" defeated predominance. The court flatly rejected each of these arguments. The court instead held that "in securities cases, courts often hold that under the fraud on the market theory, individual questions of reliance do not predominate over common questions." *Select Comfort,* at p. 27 (internal citations and omission omitted). The court also held that "common questions predominate here since the alleged fraudulent representations that generated sales of the common stock constitute a common course of conduct." *Id.* at p. 28. The present case is no different.

This is a securities case arising out of a common course of conduct and its effect on the integrity of the market price of Triton common stock during the Class Period. The fraud on the market doctrine clearly applies to this case and, as such, eliminates any individual reliance issues. Moreover, based upon the Fifth Circuit's recent holding affirming class certification in *Mullen v. Treasure Chest Casino,* there can be no doubt that certification is proper here. Indeed, if common issues predominate in a personal injury case revolving around the inhalation of second hand smoke in a casino, common issues certainly predominate in a securities fraud class action such as this, revolving around a common course of conduct in violation of a single federal law, where reliance is presumed.

### C.   Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Defendants essentially limit their challenge to certification in this case to the adequacy of the proposed Class Representatives. Like all of their other arguments, Defendants' adequacy challenge falls flat on its face. Indeed, there has perhaps never been a more adequate group of proposed class representatives in a PSLRA case than here. *See* Miller Report. Plaintiffs

dedicated almost 20 pages of their Supplemental Motion to provide evidence of these proposed Class Representatives' adequacy, both individually and as a group.  Plaintiff also provided the Court with pages and pages of deposition testimony (depositions taken by Defendants), which conclusively establish this element of Rule 23(a).  This evidence demonstrates that these proposed Class Representatives are ready, able and willing to prosecute this litigation to its completion.  *Id.; see also* Plfs.' Supp. Mot. at pp. 20-36.  They have significant knowledge regarding the facts and legal issues involved in this case.  *Id.*  They, and not their attorneys, are controlling this litigation.  *Id.*  Their knowledge about this case does not come solely from their attorneys.  *Id.*  And they are aware of their duties as Class Representatives and they have accepted these duties with open arms.   They are a united, cohesive group, dedicated to one common goal:  bringing these unscrupulous Defendants to swift and full justice for the benefit of all unnamed Class Members.  *Id.*  Nothing more is required by Rule 23(a)(4).  *Id.*

Nevertheless, Defendants rely heavily upon the Fifth Circuit's recent opinion in *Compaq v. Berger* in support of their adequacy challenge. In doing so, Defendants mischaracterize the Fifth Circuit's holding in *Compaq* and attempt to take that decision, as well as Rule 23(a)(3), to ridiculous extremes.  They also completely ignore and do not even address the comprehensive evidence set forth in Plaintiffs' Supplemental Motion.  Instead, Defendants have engaged in a blatant and gross mischaracterization of the facts surrounding each proposed Class Representative.

Defendants would have this Court believe that *Compaq* created a new legislative amendment to Rule 23(a)(3).  Under Defendants skewed (and wishful) analysis it is not enough that a plaintiff is ready, able and willing to control the litigation and possesses significant knowledge regarding the claims at issue.  To the contrary, Defendants believe that PSLRA class

representatives must, at a minimum, possess a law degree, be able to conduct discovery even in the face of the PSLRA's mandatory discovery stay, be willing to waive the attorney client and work product privileges, be clairevoyant, and have more knowledge of the ins and outs of PSLRA litigation than the attorneys and the Court combined.

In *Compaq*, the Fifth Circuit did not create a "super-plaintiff" element to Rule 23(a)(3). The court did not create any new standards under Rule 23(a)(3). *See Compaq*, 2001 U.S. Appeal Lexis at *12-21. The court did not stand hundreds of years of civil jurisprudence on its ear by eliminating the attorney client and work product privileges. *Id.* The court did not even address or opine on the issue of whether the proposed class representatives satisfied the requirements of Rule 23(a)(3) and, in fact, expressly stated that it had made no such inquiry.[5] *Id.* Quite the contrary, the court merely stated that the trial court improperly shifted the burden of proof under Rule 23 to the defendant and applied the wrong legal standards. *Id.*

Therefore, the Fifth Circuit did nothing more than reiterate two standards that have always been the law: (1) the plaintiff, not the defendant, bears the burden to demonstrate that class certification is proper under Rules 23(a) and 23(b)(3); and (2) a class representative in a PSLRA case must (a) take an active role in the litigation, (b) protect the interests of absent class members, and (c) "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." *Id.* at *11. The first issue, burden shifting, has absolutely nothing to do with the present case. Unlike the plaintiffs in *Compaq*, Plaintiffs have never attempted to shift the burden in the present case. Plaintiffs have instead gladly accepted

---

[5] Consequently, any commentary whatsoever regarding the adequacy of the plaintiffs in *Compaq* is nothing more than mere passing dicta, which has no weight or authority whatsoever. *See Zonagen*, at pp. 16-17 n.9, (in which the Fifth Circuit held that its own opinion in a previous case directly on point was "mere passing dicta" and, as such, was of absolutely no weight or significance). Moreover, it is readily apparent from even a cursory review of *Compaq*, that the *Compaq* plaintiffs are the complete antithesis to the plaintiffs in the present case.

this burden and meet it at every turn.  The second issue, the adequacy standard, also is of no consequence.  Indeed, the court merely stated that a PSLRA plaintiff must possess a sufficient level of knowledge and understanding to be capable of prosecuting the litigation, and that their knowledge should not be limited solely to derivative knowledge acquired from counsel.  *Id.* at *11-12.  This standard is met in the present case.

In their Supplemental Motion, every proposed Class Representative presented detailed factual evidence proving that they have the required understanding to prosecute this action and are clearly willing and able to do so.  *See* Miller Report; *see also* Plfs.' Supp. Mot. at pp. 20-36.  Every Class Representative has demonstrated that they are actively prosecuting and controlling this litigation and that they have sufficient knowledge regarding the facts and legal issues in this litigation to enable them to continue to prosecute and control this litigation.  *Id.* Every Class Representative has demonstrated that their prosecution of this case is a cohesive, group effort.  *Id.*

The Lead Plaintiffs are not lawyers.  As such, Lead Plaintiffs may not be capable of doing "lawyer stuff," as Plaintiff Michael Brown (a dentist) put it, such as writing briefs, engaging in oral arguments, examining witnesses, propounding discovery, writing a law review article on the fraud on the market doctrine, or determining exactly what effect the PSLRA had on the pre-amendment standard of scienter.  However, Lead Plaintiffs certainly are active in controlling this litigation.  *Id.*  They have substantial knowledge of the facts and claims at issue—knowledge which is not derived solely from counsel.  *Id.* They all have provided detailed information regarding the facts of their personal investment decisions, trades, losses, and knowledge of the facts of this case.  *Id.* They have regularly communicated with their lawyers via correspondence, telephone calls, and face to face meetings and have participated in conference calls between counsel and the other Lead Plaintiffs, in which they have discussed the strategy

being utilized in this case, provide information about their claims, investigate the facts of the case, monitor the progress of the litigation, raise and address various concerns, learn about newly discovered facts, and decide what steps should be taken next in the best interests of the Class.[6] *Id.* They have actively participated in the discovery process, not only by providing their attorneys with information, but also by actively and vigorously participating in written and oral discovery. *Id.*

In essence, these Lead Plaintiffs have done and will continue to do everything within their power to fully, efficiently, and effectively bring these Defendants to justice in the best interests of the Class. Defendants nevertheless completely ignore these facts in their Response. Instead, they put forth sound bites and incomplete and misleading deposition testimony in an attempt to make these Lead Plaintiffs appear inadequate. As shown below, each and every one of Defendants' arguments should be rejected.

### Terril

Defendants argue that Terril is unable to control the litigation because (1) he purportedly gave testimony contrary to Plaintiffs' Consolidated Complaint, (2) he became involved in this case merely by responding to a notice issued by Plaintiffs' counsel, (3) he has "handed-off" the litigation to his lawyers and (4) he did not meet with the other Lead Plaintiffs until after the class certification process began. None of these arguments have merit.

First, Terril did not render any testimony inconsistent with the Consolidated Complaint. In an obvious attempt to analogize Lead Plaintiffs to the plaintiffs in *Compaq*, who "disavowed

---

[6] The substantive content of these meetings, telephone calls, correspondence, and the like are protected from discovery by the attorney client and work product privileges. Accordingly, Plaintiffs will not—and cannot be required to—discuss the specific content of any such communication. Any discussion in this brief or in Lead Plaintiffs' depositions that such communications have occurred is in no way a waiver—or intended as a waiver—of these privileges.

**Lead Plaintiffs' Reply to Defendants' Response to Lead Plaintiffs' Opposed Supplemental Motion for Class Certification**
*In Re: Triton Energy Limited Securities Litigation*
Page-20

the allegations in the Complaint,"[7] Defendants argue that Terril contradicted Lead Plaintiffs' purported allegation that a sale of the entire company was "guaranteed." This argument is patently false and is belied by the testimony of Terril, the other Lead Plaintiffs and the misleading nature of the question. Contrary to Defendants' claim, Terril did not believe that Triton stock was extremely "risky," rather, he hoped there was a chance that Triton might sell all its reserves (because the Company had touted their world class nature) and then maybe have a "tremendous amount of cash" and go into another business. Terril Tr. at 81. Although Terril testified that he was suspicious of management at first, Triton management and the analysts who spoke to Triton management put him at ease and allayed his suspicions. *Id.* at 110-113. Further, Defendants' assertions that Terril did not rely on Triton's misrepresentations when he bought his Triton stock belies the facts in the record. It is clear that Terril reviewed and relied on Triton's public statements. *Id.* at 75, 97-100, 201.

Defendants next chastise Terril for refusing to waive the attorney client and work product privileges at his deposition. Neither the PSLRA, Rule 23(a)(4), nor *Compaq* do—or ever could—require a Lead Plaintiff to waive these privileges in order to serve as a Class Representative. In response to Defendants' improper questions, Terril did testify about his understanding of the bases for certain allegations in the Complaint. *See* Terril Tr. at 153, 162 (providing reasons why Triton's oil assets should have been written down earlier in the Class Period and that he had undertaken his own investigation to verify the allegations of the Complaint). However, Terril has engaged in lengthy discussions regarding the facts and prosecution of this case with his attorneys and all Lead Plaintiffs. As such, it is impossible to

---

[7] *Compaq*, at *11 n.10.

answer certain questions about the factual and legal theories of this case without breaching these privileges. Without breaching these privileges, however, Terril still was able to demonstrate that his knowledge of the facts in this case is superb. *Id.* at 99-100 (testifying about Defendants' false and misleading statements); 151-52 (OCENSA allegations); and 153 (write-downs). Contrary to Defendants' arguments, Terril did supply information and facts to his lawyers. *Id.* at 145-46 (Terril told his lawyers everything he knew about Triton and how he got involved investing in the Company). At no time has Terril been (or ever will be) under the obligation to reveal information that is an essential part of the attorney-client relationship or the work product privilege. Terril's refusal to breach these privileges is not evidence of inadequacy. Far from it, this is proof of his dedication and desire to adequately and vigorously represent and protect the interests all Class Members.

Second, the "notice" that Defendants complain about is the statutorily mandated notice required by the PSLRA.[8]  Under the PSLRA, the plaintiff who files the initial action must publish a notice to the class within 20 days of filing the action, informing class members of their right to file a motion for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i).  Plaintiffs here caused a notice to be published on the Business Wire on July 22, 1998.  Within 60 days after publication of that notice, any person or group of persons who are members of the proposed class may apply to the Court to be appointed as Lead Plaintiff(s), whether or not they have previously filed a complaint in this action. 15 U.S.C. § 78u-4(a)(3)(A) and (B).  Therefore, that notice, when issued, is meant to invite shareholders to join the litigation. There is nothing improper in answering that notice—Terril's actions are precisely what Congress hoped for when

it passed the PSLRA. Thus, Defendants' criticism of Terril for responding to this notice not only is a red herring, but also demonstrates just how far they will go stretch the truth.[9] Additionally, Defendants' arguments that Lead Plaintiffs are somehow inadequate because they responded to the notice mandated by the PSLRA are as offensive as they are incorrect. Indeed, how can Defendants stand before this Court and claim that a Lead Plaintiff is not an adequate representative because that Lead Plaintiff followed the express mandate of the PSLRA?

Moreover, contrary to Defendants' mischaracterizations, Terril has not "handed-off" this litigation to his lawyers. Rather, Terril testified that he has told his lawyers everything he knew about the Triton and his investment in the Company. Terril Tr. at 145-46. He has instructed his attorneys to send him copies of "everything that is happening," he has inquired "why are you doing that and what's that in response to" and is using his lawyers to "prove [his] point that the Defendants "knew a lot of this information all along and just flat lied to us about it." *Id.* at 141-42. What more is a Lead Plaintiff supposed to do? Go to law school, write his own legal briefs, try his own case? Hardly. The PSLRA is the Private Securities Litigation Reform Act, not the Pro-Se Litigation Reform Act. Finally, although Terril may have not met with the other Lead Plaintiffs early in the Action—when all discovery was stayed at the repeated urging of Defendants—he testified that he had and will continue to communicate with them and remain actively involved with them throughout the litigation. *Id.* at 200.

---

[8] Defendants raise this "notice" argument against all Lead Plaintiffs except D.H. Lee. Plaintiffs' discussion of this argument regarding Terril demonstrates that this argument is without merit. As such, Plaintiffs will not repeat this same response regarding any other lead Plaintiffs.

[9] Further, Terril testified at his deposition that he "was going to sue on my own. I was outraged at how I'd been lied to about this. And if I didn't, sooner or later, see someone else I could join in with, I was going to sue on my own." Terril Tr. at 137.

**Kelly McDonald**

Defendants next attempt to fault Kelly McDonald because (1) they claim he testified that Defendants did not guarantee a sale of the whole Company, (2) he has only participated in two conference calls with the other Lead Plaintiffs and (3) Lead Plaintiffs do not have an official agreement regarding how to handle disagreements (if there are any) between them.

Defendants "guarantee" argument is meritless.  Defendants claim that McDonald's testimony contradicts Plaintiffs' allegations in the Consolidated Complaint.  This argument misstates the truth.  For example, McDonald was asked "At the time you were purchasing Triton stock, did you believe that the company was guaranteeing that it would sell itself at a premium price?  McDonald Tr. at 111.  He responded by testifying that, although the Company may not have issued a "guarantee", "I believe that all indications that I was getting from the company through management indicated that the company would be sold at a whole – as a whole for a premium." *Id.*  More importantly, however, is the fact that Plaintiffs' do not use the word "guarantee" in their pleadings.  Quite the contrary, Plaintiffs assert, as McDonald testified, that Defendants gave the false and misleading impression that the Company would be sold, as a whole, for a premium price.  Thus, McDonald's testimony is completely consistent with the allegations set forth in the Consolidated Complaint.

Moreover, the fact that McDonald has participated in conference calls with the other Lead Plaintiffs goes to support his adequacy by demonstrating that he is involved in this litigation and working together with the entire group.  Further, McDonald has testified that there are more conference calls planned in the future and that the conference calls were something the Lead Plaintiffs decided to do – "stay[ing] in contact with each other and discuss[ing] how the case is progressing." McDonald Tr. at 162-163.  Further, McDonald has taken a special interest

in reviewing the documents produced by Defendants and third-parties in this action. At his deposition, he even testified about one of those documents—a document in which Defendants outlined their "Skeen Dhu" (Scottish for "hidden boot knife) Plan for duping investors. *Id.* at 152, 69.

Finally, with regard to disagreement resolution, as testified to by other Lead Plaintiffs, there have been no disagreements between the Lead Plaintiffs regarding the direction of this litigation and, if any arise, we will cross that bridge when we reach it. Indeed, as Brown testified, if such a dispute ever does arise, "I think that that would be something that would be necessary to get together with and work it out at the time, depending on what issues there might be." Brown Tr. at 59-60. There are no problems here and, if a problem does arise, it will be dealt with in the interest of all. Defendants should not be permitted to grasp at theoretical or hypothetical problems in an attempt to prove inadequacy. That simply will not work in this case because this is a cohesive, dedicated and determined group.[10]

Moreover, contrary to Defendants' arguments, not all the facts and knowledge that McDonald has about Triton is derived from his lawyers. In fact, just the opposite is true. Defendants are scared to death of McDonald because he testified that he had numerous (between 10 and 15) detailed conversations with Triton's Investor Relations department during the time he purchased his Triton shares. *Id.* at 43, 126. During these phone calls, Investor Relations kept "reassuring" McDonald that "everything was great, . . . the company was going to be sold for a profit, . . . . there was lots of action in the data room, . . . everything was rosy." *Id.* at 45, 67-68.

---

[10] Defendants raise this "dispute resolution" argument against Plaintiffs McDonald, Whiddon and Brown. Plaintiffs' discussion regarding this argument as to McDonald demonstrates that this argument is without merit as to all. As such, Plaintiffs will not repeat this same argument regarding any other Plaintiff.

All of these statement were—to put it bluntly—lies. McDonald gave all of this information to his lawyers, who have used it to prosecute this litigation.

### Preston Ingram

Defendants next claim that Preston Ingram does not control the litigation because allegedly (1) he is only "half-way educated" about the case, (2) he only "reviews" the documents he receives from his lawyers and then puts them in his file and (3) he spoke to the other Lead Plaintiffs from a pay-phone. Once again, Defendants' arguments are ridiculous.

First, Ingram testified that he has been in "constant contact" with his lawyers, that his counsel keep him "abreast of what's going on," and that he feels in "tune with the case." Ingram Tr. at 10-11, 92, 95-96. His knowledge of the facts of the case was demonstrated at his deposition where he testified about the allegations in the Complaint and of Triton's wrongdoing. *Id.* at 16-24. It is unclear why Defendants complain that Ingram reviews the documents in the case and then "puts them in his file." What would the Defendants like him to do, throw them out? Further, the fact that Ingram spoke to the other Lead Plaintiffs on a payphone actually demonstrates just how dedicated this man is to this litigation. What Defendants leave out of their cute quips and sound bites regarding this payphone conversation, is that Preston Ingram joined in this call on a payphone <u>because he was on vacation and that he stood on that payphone on the side of the road for over an hour and a half</u>. *Id.* at 13-14. Ingram also testified about a "long conversation" he had with his lawyers while in the barn at his farm. *Id.* at 95. If that is not evidence of a representative who is "ready, able and willing" to participate in and control this litigation, nothing is.

**Dr. Lonnie Whiddon**

Defendants next challenge Lead Plaintiff Dr. Lonnie Whiddon because allegedly (1) he merely turned over the lawsuit to his lawyers and (2) he had no communications with the other Lead Plaintiffs. These arguments should be rejected.

Dr. Whiddon, one of the most prominent heart surgeons in Dallas, Texas and an immensely successful business man, like all the Lead Plaintiffs, is strong, intelligent, and determined to win this litigation for all Class Members. Rather than merely "handing-off" the litigation to his lawyers, as Defendants contend, it is undisputed that, on a regular basis, Whiddon has communicated with his attorneys, reviewed the pleadings in the action and reviewed his lawyers' correspondence on a regular basis. Whiddon Tr. at 107. Further, as a Lead Plaintiff and a proposed Class Representative, Whiddon monitors the progress of the action to help his lawyers and is willing to do whatever else is necessary to represent the interests of the Class. *Id.* at 106.   His knowledge of the pertinent facts in the case is clear from his deposition testimony. *Id.* at 99-99, 101-02.  Moreover, even prior to contacting his lawyers in this case, Whiddon read several newspaper articles about the failed auction and believed that he was mislead. *Id.*  at 96, 98.  Further, contrary to Defendants' allegations, Whiddon has had communications with the other Lead Plaintiffs, *see* McDonald Tr. at 72, and he did not testify that he has no idea how to handle Lead Plaintiff disputes. Rather, the truth is, Whiddon testified that he could not address this question because a "possible" dispute was "too speculative." Ingram Tr. at 111.  Despite Defendants' best efforts, they cannot create a problem where none exists.

Defendants next claim that Dr. Whiddon has no knowledge of this litigation other than what he read in the Consolidated Complaint. Defendants base this argument on a misleading

statement of the facts. During his deposition, Dr. Whiddon testified for hours about his detailed knowledge of the facts and claims in this case and stated that all of this was spelled out in detail in the Consolidated Complaint. *See, e.g.,* Whiddon Tr. at 98-99; 101-02; Plaintiffs' Supp. Mtn. at 30. When Defendants asked for "facts" <u>other than</u> what Whiddon <u>had already testified to</u> (which, was extensive), he referred the lawyers to the Consolidated Complaint, which contained a full recitation of the facts in the case. Whiddon Tr. at 102. Thus, it is not true, as Defendants contend, that Whiddon relied "solely" on the Complaint for details about the lawsuit. What is true, is that Defendants' lawyers spent several hours asking the exact same questions over and over again; so, Dr. Whiddon simply referred these lawyers back to his earlier answers and the facts set forth in the Consolidated Complaint. *Id.* Further, Whiddon has worked with his attorneys to further develop the factual allegations in this case. *Id.* at 99-100. The fact that Defendants could not formulate proper questions may go to a question of adequacy—but not the adequacy of Dr. Whiddon.

### Dr. Michael Brown

Defendants next challenge Lead Plaintiff Dr. Brown's adequacy because (1) he allegedly performed no "investigation" as to why his stock declined in value and failed to continue investigating, and (2) he has not communicated with the other Lead Plaintiffs in this case.

These arguments, which are essentially the same as with Dr. Whiddon, are wrong. First, there is no doubt that Dr. Brown is controlling and contributing to the litigation. This is evidenced by Brown's unrebutted testimony: "<u>I have an interest in this lawsuit. It's my understanding that Congress has an interest in me being an active participant here, as well as the lawyers. I lost my money, so did the other class participants. And I just feel an obligation that I need to take the time to deal with this in whatever way I have to.</u>" Brown Tr. at 60. To further

this case, Brown has spoken to his lawyers on numerous occasions, given them input on Triton and will continue working with his lawyers. *Id.* at 56-57.  Further, contrary to Defendants' assertions, Brown has spoken to the other Lead Plaintiffs as a group regarding the prosecution of this lawsuit.  *See, e.g.,* Ingram Tr. at 13 (testifying that Ingram was on a conference call with the other Lead Plaintiffs).

Despite Defendants' hollow arguments about the strength of Brown's pre-filing "investigation," or his independent knowledge of the case, it is clear that, prior to joining the lawsuit, Brown understood that: (1) the auction had failed, (2) Finck had resigned, (3) the Company had taken a large financial charge and (4) the Company's stock price had dropped $10 per share on July 17, 1998.  Brown Tr. at 41, 51.  Further, Brown's testimony indicates that he has significant, independent knowledge about the facts of this case.  For example, Brown invested in Triton based on his own analysis. *Id.* at 22.  When asked how he was harmed in the litigation, Brown gave a precise summary of Plaintiffs' claims regarding Defendants' wrongdoing. *Id.* at 63.  *See also* Plfs.' Supp. Mtn. at 23.  Brown also reviewed reports in the media that Triton had misrepresented its financial condition and reserves. *Id.* at 42; *see also* Plfs.' Supp. Mtn. at 23.

Moreover, contrary to Defendants' false argument, Brown did not testify that he did not know the purpose of his Lead Plaintiff Certification.  Rather, when asked the difference between two versions of the same Certification (one had a typographical error), he said that the change in the Certification was "lawyer stuff," not that he did not understand the purpose of the Certification.  Brown is correct in stating that some parts of this litigation are "lawyer stuff."  For example, writing and signing off on this brief is "lawyer stuff."  Presenting arguments before the Court is "lawyer stuff."  And, trying this case to a successful jury verdict will be "lawyer stuff."

Surely, Defendants do not actually believe *Compaq* requires Dr. Brown to quit his dental practice, go to law school, and do all of this "lawyer stuff" pro se, in order to be an adequate representative. If they do, they are sadly mistaken.

Is there anything more Dr. Brown or any other Lead Plaintiff must do before joining a lawsuit? What else do Defendants contend he should have independently investigated? Plaintiffs have attempted to get discovery from Defendants and third parties for nearly three years. For three years, Defendants threw up road block after road block to prevent Plaintiffs from getting this discovery. When no motion to dismiss was pending, Defendants rushed to file a cursory motion to dismiss just to put the PSLRA discovery stay in effect. When that motion was denied, Defendants filed a motion to reconsider, to attempt to further delay discovery. When the motion to reconsider was denied, Defendants filed a motion to stay discovery because one of the underlying insurers in this case was having money problems. When that motion was denied, defendants told the court that discovery should be stayed because, if the Court grants certification, Defendants may run up to the court of appeals and request a stay of the case so that they can make an interlocutory appeal. All of this occurred, while counsel were vigilantly prosecuting this case on behalf of the Class, and while this Court rejected Defendants' arguments time and time again. Certainly, one would not believe that Dr. Brown would have been able to get any more information out of Defendants on his own, without the intervention of this Court, prior to filing suit.

### Val Sevilla

Defendants next claim that Lead Plaintiff Sevilla is not adequate because (1) he allegedly performed no investigation as to why the stock price of his Triton shares dropped before signing

up as a Lead Plaintiff, (2) he allegedly had no input into the pleadings in this case and (3) he has

never met any of the other Lead Plaintiffs in the Action.  Defendants are incorrect on all counts.

Sevilla is an excellent Class Representative.  He is a bottled water salesman who lost over

$175,000 on his Triton investment.  Sevilla Tr. at 19, 46-47.  Prior to joining this action, Sevilla

had seen reports about Triton on CNBC and had researched the Company on the Internet. *Id.* at

36-37.  The reports he saw on the Internet confirmed Defendants' statements that the Company

had "great" assets and that the Company would be sold for a price between $40 and $60 per

share. *Id.* at 40, 42 and 43.  Despite Defendants' assertions that Sevilla had not performed an

"investigation," it is clear that Sevilla joined the case with the knowledge that he was hurt

because he had relied on Defendants' statements and these statements were untrue.  Further, like

all Lead Plaintiffs, there is only so much Sevilla could do without the aid of his attorneys and the

intervention of this federal Court. Defendants' arguments that Sevilla had no input into the

pleadings of this case are patently false.  Sevilla testified that he has conveyed comments (and

questions) about the initial Complaint and the Consolidated Complaint in the action and that

those comments formed part of the basis of the Consolidated Complaint. *Id.* at 101-104.  Finally,

Sevilla, like all the proposed Class Representatives, has had recent conversations with his

attorneys and the other Lead Plaintiffs in the case.

Defendants also accuse Sevilla of (1) failing to conduct an investigation, (2) failing to

verify the allegations in the Consolidated Complaint, (3) failing to cite to any facts supporting

the Consolidated Complaint and (4) knowing no facts other than what he learned from his

lawyers.  Once again, Defendants are wrong.  It is clear that Sevilla is knowledgable about this

lawsuit. *See* Plfs.' Supp. Mtn. at 25-26.  Sevilla clearly came into the action with knowledge

about his own experiences investing in Triton stock and why he believed he was deceived. *Id.* at

36-37, 40, 42-43, 49-50. This knowledge pertaining to the lawsuit has not been acquired solely through counsel.   This is evidenced by Sevilla's testimony:   when asked whether "his understanding of the allegations in the complaint [was] based on either reading the complaint or talking with [his]  lawyers," Sevilla testified that <u>such was not the sole basis for his knowledge and that he had also learned certain information about Triton and his allegations from the Internet, before and after the stock dropped.</u> *Id.* at 123-24, 36-37, 40, 42-43, 49-50.

In any event, there is nothing wrong with Sevilla learning information—such as the OCENSA allegations—from his lawyers after joining the case   As illustrative, when Sevilla was repeatedly asked by Defendants' counsel as to whether he had learned certain information about the lawsuit from his attorneys, Sevilla testified that, while the case was "driven" by the plaintiffs, the more information that he and the other Lead Plaintiffs learned about the case has motivated them to prosecute the case even harder. *Id.*. at 125.  No law, not even *Compaq*, creates a prohibition against learning information from your lawyers during the prosecution of a case. What *Compaq* tries to prevent is a situation where a plaintiff who has no knowledge whatsoever about a case merely is a puppet for his lawyers.  That situation clearly is not present here. Indeed, this is a team effort where everyone—including Plaintiffs' counsel—are working diligently to make Defendants accept responsibility for their fraud.

Finally, like Terril and the other Lead Plaintiffs, Sevilla is not required to waive any privileges. Sevilla testified that he communicated with his lawyers on many occasions and gave information to them about the case which formed the basis of the complaint; however, he properly, under instruction of counsel, would not reveal the substance of those conversations. Sevilla Tr. at 104.  Defendants want to chastise Lead Plaintiffs for not "meeting" more often. Then, they want to chastise Lead Plaintiffs for not revealing the substance of their meetings with

each other and their lawyers.  Certainly Defendants would like for Lead Plaintiffs and their counsel to meet on a weekly basis and then Federal Express Defendants their notes, outlines, strategy, and a tape recording of these meetings.  Unfortunately for Defendants, that is never going to happen, and they are going to have to come up with a better way to defend this case all on their own.

### D.H. Lee

Defendants next challenge the adequacy of Lead Plaintiff D.H. Lee.  First, Defendants challenge Mr. Lee's adequacy because he filed a lawsuit the day after Triton's stock price crashed.  The argument is amazing.  Defendants chastise every other Lead Plaintiff for waiting to file their lawsuit until after they received the mandatory PSLRA notice.  Then, they chastise Mr. Lee for filing suit after he learned of the crash and met and conferred with his lawyers.  So, according to Defendants, you are inadequate if you are not the first one to file suit, but you also are inadequate if are the first one to file suit.

Lee bought the stock because of, among other things, statements made by Triton and Finck.  Lee Tr. at 14; 16.  Lee knew that Triton announced that it was conducting an auction to sell the Company.  *Id.* at 39; 40.  He was led to believe the price achieved in such a sale would have been considerably more than what he had paid for the shares.  *Id.* at 70.  Before purchasing the stock, Lee reviewed the price that he was paying.  *Id.*. at 29.  Thus, Defendants' claim that Lee is atypical because he believed oil and gas investments to be risky is false.  The next day, Lee's Triton stock plummeted by 50%.  *Id.* at 15.  When the auction process ended in disaster, Mr. Lee knew Defendants' promises were not true.  So, he met and conferred with his attorneys of 38 years that same day.  *Id.* at 54; 86; 172.  Neither Mr. Lee nor his attorneys will ever reveal the content of those discussions.  However, it is sufficient to note that, after those discussions,

Mr. Lee and his attorneys determined that, as a result of Defendants' acts/omissions, a lawsuit should be filed on a class wide basis and that he was ready, willing and able to participate as a class action plaintiff. *Id.* at 54. Mr. Lee then reviewed a copy of the lawsuit before it was filed, understood the essence of it and approved its filing. *Id.*. at 54; 86; 172. This was all Mr. Lee is required to do. If there had been no basis for Mr. Lee's initiation of this lawsuit, Defendants would have filed a Rule 11 motion for bringing a frivolous claim, and the Court would not have categorically rejected Defendants' repeated attempts to dismiss this lawsuit. Indeed, even without discovery, Defendants cannot deny they committed fraud.

Defendants next challenge Mr. Lee because his attorneys have signed certain documents for him, with permission. Mr. Lee's attorney, Mr. Patton, has been Mr. Lee's attorney for nearly 40 years. Mr. Lee has executed a power of attorney authorizing Mr. Patton to sign certain legal papers for Mr. Lee, with his permission. Mr. Lee testified that these documents were signed with his knowledge and consent. This is a common power of attorney agreement used by many attorneys. In fact, counsel would note that, on many occasions, Lead Counsel for Defendants, Ms. Hensley, has allowed her associates to sign her name on the pleadings in this case for her "with permission." Such does not make a plaintiff inadequate, any more than it does an attorney.

Defendants next argue that Mr. Lee may be inadequate because he may own certain real property together with Mr. Patton. Mr. Patton has been Mr. Lee's attorney for decades. Whether these two men have any prior or existing business relationship outside of this litigation is irrelevant to the adequacy issue. Defendants rely upon *Susman v. Eberstadt*, 561 F.2d 86 (7th Cir. 1977) for the proposition that the existence of any current or prior relationship between a proposed representative and his counsel creates a conflict of interest. This is not true. In *Susman*, the proposed class representatives had significant ties with class counsel (one plaintiff

was an associate at class counsel's law firm, another was his mother, and another was an attorney

who shared office space with class counsel) and the potential recovery per plaintiff was less than

$800.00. The district court ruled that the closeness of these relationships, together with the small

damages amounts at issue, presented a potential conflict in that the plaintiffs might act in favor

of class counsel as opposed to the best interests of the class. The *Susman* court affirmed the

district court's decision. However, it clearly held that there is not per se rule regarding the

closeness of a relationship between a class representative and his lawyer. Further, the court also

held that "judicial control over class settlements and attorney's fees might, under other

circumstances, provide adequate protection for the due process rights of absent class members."

*Id.* at 30.

Unlike *Susman*, here there is no evidence that either Mr. Lee or any business relationship

he may have with Kirk Patton will obtain any benefit from this litigation, or that Mr. Lee has an

incentive to act adversely to himself and unnamed Class Members for the benefit of Mr. Patton,

or that this relationship with Mr. Patton will affect his adequacy in any way. This is not a case

where the plaintiff is a family member of class counsel or a lawyer in his law firm. Moreover,

Patton, Haltom is not Class Counsel in this case and, contrary to Defendants' misrepresentation

of the facts, has not sought appointment as Class Counsel. To hold that Mr. Lee cannot act as a

class representative because he chose to use his trusted lawyer of over 38 years to investigate his

claims and ultimately file his lawsuit, would mean that no investor could ever use his personal

attorney in a PSLRA case if they have any pre-existing relationship. Further, Mr. Lee is but one

member of a team of seven Lead Plaintiffs who seek appointment as Class Representatives.

Thus, this is not a case where he alone will make decisions on behalf of all unnamed Class

Members. Rather, his vote will only be one of seven. And, when the time comes for an award of

attorney's fees in this case or approval of any class settlement, the Court, not Mr. Lee or his attorneys, will have the final word under Rule 23 whether (1) the settlement is fair and in the best interests of all unnamed Class Members and (2) what the final attorney's fees will be. Therefore, the longstanding relationship between Mr. Lee and his attorneys does not render him inadequate; instead, it is further assurance that Mr. Lee has a close working relationship with his attorneys and, therefore, is capable of controlling this litigation.

Finally, Defendants challenge Mr. Lee's adequacy by claiming that he has "ignored the lawsuit and looked to his lawyers to take care of everything." Defs.' Resp. at 10. This simply is not true. Mr. Lee may be an elderly man, but that does not mean he is not willing and able to prosecute and control this litigation. He is part of a team. Not every member of a team has to hit 70 homeruns like Barry Bonds. Every player has a role; some hit homeruns, some bunt, and some sit on the bench until asked to pinch hit. Mr. Lee, like all the Lead Plaintiffs, is performing his role in the joint prosecution of this lawsuit. Mr. Lee is the person who first had the foresight and courage to sue these Defendants and give up his own time, privacy, and resources to help bring them to justice for all. He went to attorneys he knew and trusted, based upon 38 years of experience with them, to evaluate his claims and determine the best course of action to achieve justice. He has provided his attorneys with vital information to the prosecution of this lawsuit. He knows his duties as a Class Pepresentative and gladly accepts them. He has worked on this team with his attorneys and his Co-Lead Plaintiffs to prosecute this case, and he will continue to do so until the end. That is all that is required under the PSLRA, Rule 23(a)(4), and the cases interpreting them.

Therefore, as set forth above, in Plaintiffs' Supplemental Motion, and in the Miller Report, it is beyond peradventure that these proposed Class Representatives meet every criteria

set forth in Rule 23(a)(4), the PSLRA, and *Compaq*. Every opposition argument raised by Defendants either is irrelevant, wrong, or completely distorts the truth. Therefore, these seven Lead Plaintiffs are adequate representatives of the Plaintiff Class.

## D.   DEFENDANTS' BLUNDERBUSS ARGUMENTS ALSO ARE WITHOUT MERIT

In a final act of desperation, Defendant have lodged a blunderbuss attack upon Lead Plaintiffs' Supplemental Motion. Defendants claim that certification is improper because (1) the proposed Class Representatives did not hold a large enough stake in the Company, (2) some proposed Class Representatives lack credibility, (3) some Class Representatives actually profited from their ownership of Triton stock and (4) the proposed Class definition is too broad. These arguments too must fail.

First, Defendants' claim that this group consists of "individual investors without the financial stake contemplated by the PSLRA to serve in a lead plaintiff role" is a red herring. Lead Plaintiff status is not before the Court. The Court already has issued an Order appointing each of these proposed representatives as Lead Plaintiffs under the PSLRA. The focus here is adequacy, not the size of a specific individual's losses or investments.

Second, Defendants' credibility argument also lacks merit. Defendants have accused two Lead Plaintiffs, Sevilla and Ingram, of spoliation of evidence.[11] These arguments are made in a last-ditch effort to prevent certification of the class here. Absent a showing of intent and bad-faith, however, one cannot prove spoliation. *See United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000) (citing cases). Defendants cannot meet this burden.

---

[11] Defendants also claim that Lead Plaintiffs Terril and McDonald lack credibility. Defendants claim McDonald failed to specify that his shares of Triton were held by CJ Investments and not him individually and that Terril was "not forthcoming" regarding his representative status. Defs.' Resp. at 29. Plaintiffs have previously demonstrated the irrelevance and falsity of these red herring arguments in Section III.C, *supra*.

The documents which Sevilla allegedly threw away—stock purchase confirmations and a "few press releases" he printed off the Internet—do not come close to meeting the elements of spoliation and prejudicing defendants in this case. Sevilla Tr. at 51.   Sevilla merely threw these documents away because they reminded him of a "very bad experience." *Id.* at 52.   In fact, Sevilla testified about the information he reviewed prior to purchasing his Triton shares. *See Id.* at 36-37 (CNBC and the Internet); *Id.* at 40, 42-43 (J.P. Morgan, Merrill Lynch and First Boston reports); and *Id.* at 49-50 (quotes from Finck stating that the Company will be sold, the assets of the Company are undervalued and that Wall Street is not looking at the Company enough). These documents, even if lost, are publicly available and can easily be recreated for trial. Therefore, just as there is no bad faith or intent, there is no harm to Defendants.   Likewise, Preston Ingram has not been involved in spoliation.   Rather, he testified that he has recently moved offices and that he may have had, at one time, "old literature on Triton."   Ingram Tr. at 85.   Although Ingram testified that those documents (if they exist or ever existed) might still be in an unpacked box *Id.* at 85,   Ingram could not point to any specific Triton documents that he ever actually had in his possession and did not know during what period of time those documents are from.   Even so, Ingram offered to check the unpacked boxes in his office to see if he had any Triton literature. *Id.* at 87.   He has not engaged in any spoliation, much less acted with intent or in bad faith, and Defendants have not suffered any prejudice thereby.

Third, Defendants claim that Lee, McDonald, and Ingram may have made money on some of their trades of Triton stock and thus have no standing.   This argument is another red herring.   Plaintiffs allege that Defendants' acts and/or omissions artificially inflated the price of Triton's common stock.   Therefore, any Class Member who purchased Triton common stock during the Class Period did so at an inflated price.   It is well established under the securities laws

that damages are determined by the "out-of-pocket" rule.  That rule dictates that damages are determined between the stock purchase price and the true value of the stock <u>as of the date of purchase</u>.  *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436-37 (9th Cir. 1987) (because of the out-of-pocket rule these issues are a question of fact appropriate for trial); *see also Queen Uno Ltd. Pshp. V. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687 (D.Col. 1998).  Sales <u>after</u> the Class Period are not figured in that analysis. Any alleged "profit" achieved by Ingram, Lee or McDonald would have come through sales after the Class Period and, therefore, is not part or the analysis.

Moreover, even if a Class Member ultimately sold some of his or her shares at greater price than the purchase price, his or her profit margin would be reduced as a result of the artificial inflation.  The focus is on the value at the date of purchase.  Thus, if a plaintiff purchased his stock at a price of $37 a share but sold his stock at a price of $45 per share, he would make a profit of $8 per share.  However, if the true value of the shares on the purchase date was $27 a share (as evidenced by the price of Triton's stock after the failure of the auction process was revealed), the plaintiff's true profit margin should have been $18 a share—a net loss of $10 a share on the purchase date or $18 a share upon the date of sale.  Thus, even if a plaintiff made a profit, he or she still suffered significant damages due to the artificial inflation of the market price for Triton common stock. This is a basic, simple economic truth, which may go to the issue of the amount of actual damages to be awarded at trial, but has nothing to do with the propriety of certification. *See Crossman*, 100 F.R.D. 784 (whether certain class members sustained any damages at all is not a question to be decided at class certification); *Marion Merrell Dow, Inc., Sec. Litig.*, 1994 U.S. Dist. LEXIS 10053, *15 (W.D. Mo. July 18, 1994) (issue of damages is for the jury).  Most importantly, the amount of damages is an issue for trial.

Defendants next claim that Ingram lacks credibility because "he admitted during his deposition that information contained in his sworn certification and interrogatory answers is wrong." Defs.' Resp. at 30.  Specifically, Defendants claim that Ingram claims he sold 43,000 Triton shares in late 1998 or 1999 for a loss, when, in reality, he sold 43,000 shares in 2001 for a profit.  This argument is completely false.  Ingram's certification and interrogatory answers are completely correct and he never testified that they were not.  These documents show the Ingram purchased 43,000 shares during the Class Period.  *See* Ingram's Lead Plaintiff Certification and Responses to Interrogatories, attached hereto as Exhibit C.  These documents also correctly reflect that Ingram sold 43,000 put options at year end 1998 (January 4, 1999) at a price of $11.00.  To further prove this fact, Plaintiffs have attached Mr. Ingram's January 1999 PaineWebber Investment Account statement ,which clearly proves that Mr. Ingram did in fact sell 43,000 shares at a price of $11.00 per share.  A true and correct copy of this statement is attached hereto as Exhibit D.  Ingram's deposition testimony is entirely consistent with these documents.  And, Defendants' claim that he misrepresented the true dates of his transactions is an outrage.  The only persons lacking credibility are Defendants, who failed to accurately research the facts and instead, made allegations that are completely false. Moreover, as discussed above, even if Ingram ultimately sold shares after the Class Period at a profit, the focus for damages is upon the artificially inflated purchase price during the Class Period and the amount of damages is an issue for trial, not certification.

Finally, Defendants claim the Class Definition is too broad.  Defendants complain that by dropping the phrase "who were damaged thereby" from the proposed Class definition, makes the definition too broad and creates conflicts with persons who made a profit from their trades.  As discussed above, any person who purchased Triton common stock during the Class Period did so

at an artificially inflated price; therefore, they were damaged as a result. As such, the Class definition automatically includes all persons "who were damaged thereby" because all persons who purchased this stock during the Class Period were damaged thereby. Further, the phrase "or otherwise acquired" is a common phrase in most PSCRA class definitions. This is yet another red herring argument.[12] Therefore, Defendants' blunderbuss arguments, like all the others, must fail.

## IV. CONCLUSION

WHEREFORE, Plaintiffs pray that this action be certified as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiff Class as defined herein, that Plaintiffs be certified as the Representatives of said Class, and that Plaintiffs' attorneys be certified as Class Counsel.

Respectfully submitted,

By: _____
BRADLEY E. BECKWORTH
SBN: 24001710

*NIX, PATTERSON & ROACH, L.L.P.*
Gary Patterson
Jeffrey J. Angelovich
Bradley E. Beckworth
205 Linda Drive-P.O. Box 679
Daingerfield, Texas 75638

**Plaintiffs' Co-Lead Counsel**

*MILBERG WEISS BERSHAD HYNES & LERACH, L.L.P.*
Keith M. Fleischman

---

[12] If the Court were to find any defect in the proposed Class definition, the law is clear that the Court can and should cure any such defects by amending the proposed definition as appropriate.

U. Seth Ottensoser
One Pennsylvania Plaza
New York, New York 10119-0165

**Plaintiffs' Co-Lead Counsel**

***PATTON, HALTOM, ROBERTS,
   MCWILLIAMS & GREER***
George L. McWilliams
Richard A. Adams
700 Hibernia Bank Building
P.O. Box 1928
Texarkana, Texas 75504

***LAW OFFICES OF YOUNG & PICKETT***

Lance Lee
State Bar No. 24004762
Damon Young
State Bar No. 22176700
4122 Texas Blvd-P.O. Box 1897
Texarkana, Texas 75503
(903) 794-1303 Telephone
(903) 794-5098 Facsimile

**PLAINTIFFS LIAISON COUNSEL**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above and foregoing instrument has this 5th day of October, 2001, been forwarded by hand-delivery or U.S. Mail, to all known counsel for the Defendants.

Brad Beckworth

**Lead Plaintiffs' Reply to Defendants' Response to Lead Plaintiffs' Opposed Supplemental Motion for Class Certification**
*In Re: Triton Energy Limited Securities Litigation*
Page-42

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Plaintiffs conferred with counsel for Defendants.  Counsel for Defendants indicated that they oppose this Motion.

Brad Beckworth

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 99-884(DSD/JMM)

------------------------------

In re:     Select Comfort Corporation
           Securities Litigation

This Document Relates to:  All Actions

------------------------------

Richard A. Lockridge, Esq., Karen M. Hanson, Esq. and
Lockridge, Grindal & Nauen, 100 Washington Avenue South,
Suite 2200, Minneapolis, MN 55401, Robert M. Kornreich,
Esq., Michael A. Schwartz, Esq. and Wolf & Popper, 845
Third Avenue, New York, NY 10022 and Regina LaPolla,
Esq., Benjamin Y. Kaufman, Esq., and Milberg Weiss,
Bershad, Hynes & Lerach, One Pennsylvania Plaza, 49th
Floor, New York, NY 10119-0165, counsel for plaintiffs.

Michael J. Bleck, Esq., Michael E. Keyes, Esq. Carey S.
Meyer, Esq. and Oppenheimer, Wolff & Donnelly, 3400 Plaza
VII Building, 45 South Seventh Street, Minneapolis, MN
55402, counsel for defendants.

This matter is before the court on plaintiffs' motion for

class certification.  Based upon a review of the file, record and

proceedings herein, and for the reasons stated, the court grants

plaintiffs' motion.

## BACKGROUND

This action arises out of allegations by the plaintiffs that

defendants violated Sections 11, 12(a)(2) and 15 of the Securities

Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934.  Plaintiffs allege that defendants made a series of

**EXHIBIT**

**A**

FILED  9-5-01
RICHARD D. SLETTEN, CLERK
Judgment Ent'd.

false and misleading public statements that either misrepresented or omitted material information relevant to the value of common stock issued under the company's registration statement and prospectus dated December 4, 1998, and which was declared effective by the Securities Exchange Commission ("SEC") on December 3, 1998, and filed in connection with Select Comfort's initial public offering ("IPO").

In particular, plaintiffs allege that defendants failed to adequately and completely disclose the following information: (1) the dependence of Select Comfort's sales and revenue growth on the company's ability to provide its customers favorable credit terms that would not be available in an arms-length transaction; (2) that access to easy credit for Select Comfort's customers had been effectively eliminated by late November 1998; (3) that Select Comfort began experiencing a decline in sales and revenue as early as November 1998 due to the loss of its ability to provide its customers favorable credit terms; and (4) that access to credit for customers could not be obtained on the same, or as favorable, terms from an independent financing agent so there was no prospect for sales to increase or revenues to grow. (See Pls.' Mem. Supp. Class Cert. at 2.)

Plaintiffs allege that because none of these material facts were disclosed to investors, the price of Select Comfort's common stock was artificially inflated during the class period and class

members who purchased Select Comfort's common stock during that period did so at artificially inflated prices. (Id.) Plaintiffs further allege that the true status of Select Comfort's financial condition was not disclosed to the public until a June 8, 1999 press release. (Id.) After that announcement, Select Comfort's common stock plummeted 43 percent in a sell-off on trading volume of over 5.6 million shares.[1] (Id.)

Pursuant to Rule 23 of Federal Rules of Civil Procedure, plaintiffs move for class certification. Defendants oppose class certification on various grounds including typicality of the claims and adequacy of the proposed representatives, each of which is discussed fully below. Defendants also assert that plaintiffs are attempting to improperly certify one class for two distinct claims. Plaintiffs, however, respond that they are properly seeking certification of a class consisting of two subclasses comprised of: (1) an IPO subclass;[2] and (2) a 10b-5 subclass.[3] For the reasons stated the court conditionally certifies the following class of:

---

[1]   Plaintiffs allege that this transaction was twenty-five times the three month average daily trading volume and the lowest close on the stock since the company went public in December 1998, representing a decline of approximately 75% in value from January 1999. (Id.)

[2]   Comprised of those asserting claims under § 11, § 12(a)(2) and § 15.

[3]   Comprised of those asserting claims under § 10(b) and § 20(a).

3

All persons and entities, other than
defendants and their heirs, successors and
assigns and the members of the individual
defendants' immediate families, who:
(i) purchased Select Comfort stock issued
under and/or traceable to the company's
registration statement/prospectus dated
December 4, 1998 which was declared effective
by the SEC on December 3, 1998 and filed in
connection with Select Comfort's IPO; or
(ii) purchased Select Comfort common stock in
the open market during the period December 4,
1998 through June 7, 1999, and who were
damaged by defendants' violations of the
federal securities laws.[4]

## DISCUSSION

Class certification is governed by Rule 23 of Federal Rules of

Civil Procedure.   That rule requires a two step analysis to

determine whether a class is appropriate.   First, plaintiffs must

satisfy the four prerequisites in Fed. R. Civ. P. 23(a) by

demonstrating that: (1) the class is so numerous that joinder of

all members is impractical (numerosity); (2) there are questions of

---

[4] As will be discussed in greater detail below, the first
subclass reflects the court's incorporation of amendments to
plaintiffs' original class certification definition since it takes
into account those in the IPO subclass who may have purchased stock
on December 3, 1998, after the SEC declared the prospectus and
registration dated December 4, 2001, effective.   Initially
plaintiffs sought a subclass(i)defined as a class comprised of
those who had "purchased Select Comfort common stock issued under
and/or traceable to the Company's Registration Statement/Prospectus
dated December 4, 1998 filed in connection with Select Comfort's
IPO."   Based upon plaintiffs' argument during the hearing on June
14, 2001, and the extensive record before the court, the court has
modified the requested class to conform with what it considers to
be the applicable dates permissible without amending the underlying
complaint. (See Pl. Dale Compl. ¶ 1.)

4

law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interest of the class (adequate representation).  Second, the action must satisfy at least one of the three subdivisions of Rule 23(b).[5]

## A.   Rule 23(a) Requirements

In order to satisfy the threshold requirements of Rule 23(a), the named plaintiffs must establish that the four above-mentioned criteria are met.   The court exercises broad discretion in determining whether such criteria are satisfied.   See Reiter v. Sonotone Corp., 442 U.S. 330, 345 (1979).

### 1.   Numerosity

Numerosity requires that the proposed class be so numerous that joinder is impractical.  Fed. R. Civ. P. 23(a)(1).   Courts have typically established no arbitrary or rigid rules regarding the required size of a class, and what constitutes impracticality depends upon the facts of each case.   See Parkhill v. Minnesota

---

[5] Rule 23(b) reads, in relevant part:
(b)  Class Actions Maintainable.   An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
. . .
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
Fed. R. Civ. P. 23(b).

5

Mut. Life Ins. Co., 188 F.R.D. 332, 337 (D. Minn. 1999). Factors relevant in assessing the impracticality of joining all class members include the number and geographical dispersion of persons in the class, the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the impracticability of joining the class members. Paxton v. Union Nat'l Bank, 688 F.2d 552, 561 (8th Cir. 1982). The parties do not dispute that the numerosity requirement is met in this matter. (See Def.'s Mem. Opp'n Class Cert. at 15.) Accordingly, the court concludes that the numerosity requirement is satisfied.

### 2. Commonality Requirement

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Eighth Circuit has consistently held that the commonality requirement is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation even though the individuals may not be identically situated. See DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1174 (8th Cir. 1995) (citing Paxton, 688 F.2d at 561). Factual variances among class grievances will not defeat the commonality requirement so long as the claims arise from a common nucleus of operative facts. Id. See also

Newberg on Class Actions § 3.10 (3d ed. 1992) (commonality will be found if the defendant has engaged in a "course of conduct that affects a group of persons and gives rise to a cause of action.").

Defendants maintain that plaintiffs' proposed class fails to meet the commonality requirement because the Section 10(b) claims are separate and distinct from the Section 11 and Section 12(a)(2) claims. Defendants assert that since there are varying burdens of proof and pleading requirements for these differing claims,[6] the two cannot be joined together in one action.[7]

Plaintiffs counter that any problems arising from the differing burdens of proof or legal standards of the varying claims are resolved by the fact that they have moved for certification of a class comprised of two subclasses. (See Pls.' Reply Mem. at 2.) That is, since the proposed class here is made up of two distinct subclasses, any differences in the substantive variations of the legal claims asserted are fully taken into consideration.

The court agrees with plaintiffs that a single class consisting of two subclasses may be properly certified in this

_____

[6] Specifically, the 10b-5 claims differ from the IPO claims in the necessity of proving scienter, reliance and damages. See 15 U.S.C. § 77k(a); 15 U.S.C. § 77l (a)(2).

[7] Defendants cite to Reichert v. Bio-Medicus, Inc., 70 F.R.D. 71, 75-76 (D. Minn. 1974), for the proposition that when common factual and legal issues do not predominate, class action status should be denied. The court however is not persuaded that Reichert is instructive here since it does not directly consider or take into account the use of subclasses.

action.  There is clearly a common nucleus of operative facts.  The

predominant focus of the defendants' alleged conduct centers upon

a series of purportedly false and misleading statements directed to

the investing public about defendants' financial performance,

sales, revenues, accounts receivable and business prospects that

impacted the price of defendants' common stock.[8]   In sum,

defendants' liability for their alleged conduct that purportedly

artificially inflated the price of their common stock is the

essential focus of this litigation, and it predominates over any

individual issues that may arise.  See In Re Am. Cont.

Corp./Lincoln Sav. & Loan Sec. Litig., 140 F.R.D. 425, 431 (D.

Ariz. 1992) ("it would be folly to force each [investor] to prove

the nucleus of the alleged fraud again and again.").

---

[8] For example, plaintiffs assert that the common questions
include: (1) whether the federal securities laws were violated by
defendants' alleged misconduct; (2) whether statements made by
defendants to the investing public misrepresented or omitted
material facts concerning defendants' market condition, growth
prospects and sales results and forecasts; (3) whether defendants'
statements during the class period omitted material facts
concerning the company's customers' access to consumer credit
necessary to make the company's statements concerning its sales not
misleading in light of the circumstances under which they were
made; (4) whether defendants acted with scienter in making such
misstatements and omissions; (5) whether the price of defendants'
common stock was artificially inflated during the class period due
to defendants' misrepresentations and omissions; (6) whether the
prospectus and registration statement disseminated by defendants
omitted or misrepresented material facts; (7) whether the
individual defendants were control persons at the time of the IPO
or during the class period; and (8) whether members of the class
sustained any damages.  (See Pls.' Mem. at 7.)

The court thus concludes that the certification of a class comprised of two subclasses is a proper and expedient way to deal with the differing legal standards of the claims asserted while also taking into account the common nucleus of operative facts. See Fed. R. Civ. P. 23(c)(4)(B) ("[w]hen appropriate ... a class may be divided into subclasses and each subclasses treated as a class."); In re VMS Sec. Litig., 136 F.R.D. 466, 474 (N.D. Ill. 1991) (permitting use of subclasses in securities litigation); Manual For Complex Litigation (Third) (1995) § 30.15 (discussing that the district court has discretion to certify a class comprised of subclasses). In other words, since the claims here arise from allegations of a common scheme of defendants' alleged misrepresentations regarding securities and any substantive disparities are fully accounted for by the aforementioned subclasses, the court believes that plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23(a)(2).

### 3.  Typicality

Rule 23(a)(3) requires that the claims of the representative parties be "typical" of those of the class members that they seek to represent. As the Eighth Circuit noted in Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996) (citations omitted), typicality is met where there are "other members of the  class who have the same or similar grievances as the plaintiff." A named plaintiff's claim is typical "if the claims or defenses of

the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." <u>Paxton</u>, 688 F.2d at 561.  The burden is "fairly easily met so long as other class members have claims similar to the named plaintiff." <u>Alpern</u>, 84 F.3d at 1540.  "'So long as plaintiffs rely upon the same legal theory and their claims arise from the same course of conduct, the typicality requirement is satisfied.'" <u>In re Tricord Sys. Inc. Sec. Litig.</u>, No. 3-94-746, 1996 U.S. Dist. LEXIS 20943, at *24 (D. Minn. April 5, 1996) (quoting <u>In re Regal Communications Corp. Sec. Litig.</u>, [1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) P. 98,871 at 93,234 (E.D. Pa. Sept. 25, 1995)).  <u>See</u> <u>Paxton</u>, 688 F.2d at 561-62 (holding that typicality is met when the claims of the named plaintiffs emanate from the same event or are based upon the same legal theory as the claims of the class members).



Moreover, typicality is closely related to commonality as "a finding of one generally compels a finding of the other." <u>See</u> <u>Buycks-Roberson v. Citibank Fed. Sav. Bank</u>, 162 F.R.D. 322, 333 n.13 (N.D. Ill. 1995) (citing <u>Newberg</u> § 3.13).  It is also well recognized that the district court has "broad authority to define or redefine the class until judgment is entered or to otherwise alter or amend any class certification order before the decision on the merits." <u>White v. Snider</u>, No. 93-3666, 1994 WL 105525, at *3 (E.D. Pa. March 30, 1994); <u>see also</u> Fed. R. Civ. P. 23(c)(1)

(providing that an order certifying a class "may be altered or amended before the decision on the merits").

Defendants assert that the typicality requirement is not met in either subclass because two of the named plaintiffs are subject to unusual facts or unique defenses that may divert attention from class-wide issues or that may potentially prejudice the claims of absent class members.  For the following reasons, the court is not persuaded by this assertion.

### a.   IPO Subclass

In their initial motion plaintiffs sought certification of an IPO subclass defined as:

> [A]ll persons and entities ... who: (i) purchased Select Comfort common stock issued under and/or traceable to the Company's Registration Statement/Prospectus dated December 4, 1998 filed in connection with Select Comfort's IPO; or (ii) purchased Select Comfort common stock in the open market during the period December 4, 1998 through June 7, 1999.

(Pls.' Mem. Supp. Class Cert. at 2-3.)

The proposed class representative of the first subclass is Heidi Dale ("Dale") who purchased 100 shares of common stock in Select Comfort's IPO.  Because Dale made her purchase on December 3, 1998, not on December 4, 1998, defendants assert that she is not a member of the IPO subclass she purports to represent and cannot serve as its class representative.  See Sosna v. Iowa, 419 U.S. 393, 403 (1975) (providing that a named plaintiff must be a member

of the class she purports to represent.)   That is, defendants
believe that, given her date of purchase, Dale cannot represent the
proposed subclass since her claims are atypical of the other likely
members of the proposed subclass.

Plaintiffs argue that contrary to defendants' assertions Dale
is a member of the class that she purports to represent and can
serve as the subclass representative. Plaintiffs contend that they
initially chose the commencement date of December 4, 1998 for the
proposed IPO subclass because the company's registration statement
and prospectus were dated December 4, 1998. Furthermore, while the
SEC declared the IPO effective at 4:30 p.m., eastern standard time
("EST"), on December 3, 1998, after the NASDAQ stock market had
closed for the day, plaintiffs initially and mistakenly believed
that the first trades in Select Comfort stock could not have
occurred until December 4, 1998. They further assert that it was
not until June 1, 2001, when during discovery they received the
declaration of Robert Neubeck, a Charles Schwab & Co. trading
manager, that they learned that Dale had purchased the Select
Comfort shares issued in the IPO earlier than the December 4, 1998
date on prospectus, *i.e.* after the registration statement and
prospectus were declared effective on December 3, 1998.   The
plaintiffs therefore have asked this court, pursuant to Fed. R.
Civ. P. 23, to amend the proposed definition of the first subclass

to take into account this evidence and to specify that the effective dates of the period for subclass (i), in fact, began on December 3, 1998.[9]

Defendants counter that any request to amend the motion for class certification must be denied on three bases: (1) the class period cannot be enlarged without amending the underlying complaint; (2) previous court orders have already cut off the time for amending the pleadings or adding new parties; and (3) the one year statute of limitations has expired for bringing any claims of those who may have purchased on December 3, 1998. (See Defs.' Supplemental Mem. at 1.)

Plaintiffs assert that no amending of the complaint is required since they have properly alleged claims on behalf of all persons and entities who acquired Select Comfort common stock issued under the company's registration statement and prospectus *dated* December 4, 1998, and all persons and entities who acquired Select Comfort common stock in the open market during the period

---

[9] While it appears from the briefs that plaintiffs initially requested an amendment to <u>both</u> subclasses to date back to December 3, 1998, the court believes that only subclass (i) can be properly considered and amended since this subclass reflects those in the IPO subclass who may have purchased stock on December 3, 1998, after the SEC declared the prospectus and registration statement dated December 4, 2001, effective. (See Pls.' Reply Mem. at 4.)

December 4, 1998 through June 7, 1999, traceable to the company's IPO.[10]

   In sum, plaintiffs argue that a plain reading of paragraph 1 of the Dale complaint makes it clear that this complaint seeks to represent all persons and entities who acquired Select Comfort common stock in the IPO which commenced when the SEC declared the registration statement and prospectus effective on December 3, 1998 at 4:30 p.m. (EST). Moreover, plaintiffs assert that since this subclass has not yet been certified, and considering that a district court is recognized to have "broad authority to define or redefine the class until judgment is entered or to otherwise alter

---

   [10] Paragraph 1 of the complaint reads:

> This class action against Select Comfort Corporation ("Select Comfort" or the "Company") and certain of its former officers and directors is prosecuted on behalf of Heidi Dale and a class consisting of all other persons and entities, other than defendants and their affiliates, assigns, and the members of the individual defendants' immediate families, who acquired Select Comfort common stock issued under the Company's Registration Statement and Prospectus ("Registration Statement/Prospectus") dated December 4, 1998, which was declared effective by the Securities and Exchange Commission ("SEC") on December 3, 1998, and filed in connection with Select Comfort's initial public offering (the "IPO"), during the period December 4, 1998 through June 7, 1999 (the "Class Period"), and who were damages by defendants' violations of the federal securities laws (the "Class").

(Pl. Dale Compl. ¶ 1.)

14

or amend any class certification order before the decision on the merits," the court is free to amend and alter the definition of subclass (i) as it deems necessary. White, 1994 WL 105525, at *12. See also Fed. R. Civ. P. 23(c)(1) (order certifying a class "may be altered or amended before the decision on the merits"); In re VMS Sec. Litig., 136 F.R.D. at 476 (permitting plaintiffs to amend class definition to provide for subclasses where plaintiffs had initially alleged both § 10(b) and § 11 claims as a single class).

The court agrees with the plaintiffs' position. As an initial matter, the court is not convinced that the original definition of this subclass would have precluded Dale from serving as its class representative. The initial definition clearly proposed a class of "all persons ... who: (i) purchased ... stock issued under and/or traceable to the Company's Registration Statement/Prospectus dated December 4, 1998 filed in connection with [the] IPO." (Pls. Mem. Supp. Class Cert. at 2). The court believes that, while Dale purchased on December 3, 1998, her purchase was clearly "under and or traceable to" the December 4, 1998 registration statement and prospectus filed in connection with the IPO. (Id.) Thus, the court is not convinced that plaintiffs would have had to request a modification of the definition of this subclass. Notwithstanding, for the reasons that follow, the court believes that plaintiffs' proposed changes can and should be incorporated into the definition of this subclass.

15

Furthermore, contrary to defendants' assertion, the court concludes that no amending of the initial complaint is required since the Dale complaint properly alleges claims on behalf of all persons and entities who acquired Select Comfort common stock in the company's IPO. The court notes that the Dale complaint clearly refers to the only common stock public offering made by Select Comfort in December, 1998. The court also concurs with the plaintiffs' contention that a plain reading of paragraph 1 of the Dale complaint makes it absolutely clear that the Dale complaint seeks to represent all persons and entities who acquired Select Comfort common stock in the IPO pursuant or traceable to the registration statement and prospectus dated December 4, 1998.

The court thereby concludes that since the Dale complaint properly alleges claims on behalf of all persons and entities who acquired Select Comfort common stock in the IPO, which commenced when the SEC declared the registration statement prospectus effective on December 3, 1998, at 4:30 p.m. (EST), regardless of when they acquired the registered shares, the Dale complaint need not be amended as defendants contend. Rather, the motion for class certification will be modified to reflect that the class period conforms to the December 3, 1998 effective date supported by the record.

Finally, the court believes that plaintiffs' proposed changes to the definition of subclass (i) are appropriate and well-reasoned

16

in light of the undisputed facts.  The court has broad authority to define and redefine classes and subclasses until final judgment is entered pursuant to the Fed. R. Civ. P. 23(c)(1).  See White, 1994 WL 105525, at *12; In re VMS Sec. Litig., 136 F.R.D. at 476.  Thus, the court will adopt and incorporate plaintiffs' proposed amendment to the definition of subclass (i) as follows:

> All persons and entities, other than defendants and their heirs, successors and assigns and the members of the individual defendants' immediate families, who: (i) purchased Select Comfort stock issued under and/or traceable to the company's registration statement/prospectus dated December 4, 1998 which was declared effective by the SEC on December 3, 1998 and filed in connection with Select Comfort's IPO; ...

The court further concludes that, in light of the undisputed record, the proposed representative Dale falls within the parameters of subclass (i).[11]  Accordingly, plaintiffs have

---

[11] Defendants also argue that Dale cannot represent a subclass of claimants who seek damages under § 12(a)(2) because she did not directly purchase her common stock from the "seller" in the IPO but instead from Schawb one of the underwriters.  In other words, defendants challenge Dale's privity for maintaining a § 12(a)(2) claim.  The court however is unconvinced by this argument. The term "seller" has been defined in the context of § 12(a) to include any person "who successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Pinter v. Dahl, 486 U.S. 622, 647 (1998); In Re NationsMart Corp. Sec. Litig., 130 F.3d 309, 314 (8th Cir. 1997) (adopting Pinter definition of seller in the Eighth Circuit).  Thus, the law does not require plaintiffs to show that the issuer directly sold shares to the class members in order to maintain a claim.  In sum, since the facts support a conclusion that Select Comfort had a desire for financial gain,
(continued...)

satisfied the requirements of Rule 23(a)(3) as to this subclass.

**b.   10b-5 Class**

Defendant also attacks class representative Louis Bohl ("Bohl") asserting that he cannot serve as a class representative because he is subject to unique defenses which are not typical of the other 10b-5 claims.  (See Defs.' Mem. Opp. Class Cert. at 23.) In particular, defendants assert that Bohl purchased Select Comfort stock after the close of the class period, after the litigation had commenced and after he had completed his certification to serve as lead plaintiff.

Plaintiffs counter that typicality is met where there are other members of the class who have the same or similar grievances as the class representative, and since Bohl has claims that arise from the same course of conduct, the typicality requirement is satisfied.  See Alpern, 84 F.3d at 1540.  In re Tricord Sys. 1996 U.S. Dist. 20943, at *24 ("'[s]o long as plaintiffs rely upon the same legal theory and their claims arise from the same course of conduct, the typicality requirement is satisfied.'") (quoting In re Regal Communications Corp. Sec. Litig., [1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) P. 98,871 at 93,234 (E.D. Pa. Sept. 25, 1995)). Plaintiffs also assert that even if there were defenses unique to lead plaintiff Bohl, they would not preclude a finding of

---

[11](...continued)
defendants fall squarely within the Pinter definition of seller.

typicality.  Plaintiffs point to the <u>Trief</u> case that provides, "it
is beyond reasonable dispute that a representative may satisfy the
typicality requirement even though that party may later be barred
from recovery by a defense particular to him that would not impact
other class members."  <u>Trief v. Dun & Bradstreet Corp.</u>, 144 F.R.D.
193, 200-01 (S.D.N.Y. 1992).[12]

     After a careful review, the court agrees with the plaintiffs'
position.  Bohl possesses the same interest and suffered the same
injury as the other class members.    See <u>In re Endotronics</u>, Fed.

---

[12] Courts routinely certify a class with representatives who
purchased stock during and after a class period.  In fact,
purchasing stock subsequent to a materially adverse disclosure,
"averaging down," is a common technique used to decrease the
average cost of an investment and which cannot be used to defeat a
proposed class representative's typicality. <u>Antonson v. Robertson</u>,
141 F.R.D. 501, 508 (D. Kan. 1991); <u>Kronfeld v. Trans World
Airlines, Inc.</u>, 104 F.R.D. 50, 53 n.4 (S.D.N.Y. 1984); <u>In re Adobe
Sys. Inc. Sec. Litig.</u>, 139 F.R.D. 150, 155 (N.D. Cal. 1991)
(discussing the fact that plaintiff may have known about the
misrepresentation subsequent to the class period, but prior to his
purchase of more of defendant's securities, does not at all rebut
the presumption of reliance). Bohl testified at length to his use
of the "averaging down" technique in his Select Comfort
transactions as well as with other stocks.  (See Bohl Dep. 145-9,
152-3, 161-2.)    Thus, defendants' assertion that Bohl is an
atypical investor who cannot represent the proposed subclass fails.
Plaintiffs also correctly assert that those who may have bought and
sold during the class period, the "in-and-out" traders, and the
"short sellers" may still properly be members of the subclass. <u>See
Nathan Gordon Trust v. Northgate Exploration Ltd.</u>, 148 F.R.D. 105,
108 (S.D.N.Y. 1993); <u>Davis v. USN Communications, Inc.</u>, 189 F.R.D.
391, 396 (N.D. Ill. 1999) (recognizing that plaintiff class is
likely to include traders with divergent motivations and trading
strategies).    While these varying trading strategies may create
later issues as to the assessment of individual damages, the court
holds that the fact that some of the 10b-5 subclass members may
have employed distinctive trading strategies does not render them
atypical.

Sec. L. Rep. (CCH) ¶ 93,664, at 98,047 (D. Minn. Jan. 28, 1988); Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992). The existence of potential defenses unique to a named plaintiff does not automatically preclude a finding of typicality. See Gaspar v. Linvatec Corp., 167 F.R.D. 51, 58 (N.D. Ill. 1996) (discussing that only when a unique defense is likely to consume the entire case should it be grounds to preclude certification); ABT v. Mazda Am. Credit, No. 98-C-2931, 1999 WL 350738, at *3 (N.D. Ill. May 19, 1999) ("[t]he existence of defenses unique to the named plaintiff does not automatically preclude a finding of typicality ... because Rule 23(a)(3) requires typicality of plaintiffs' claims, not defenses."). The record reflects that Bohl purchased Select Comfort stock during the class period, and like all other class members, allegedly overpaid because the stock price was artificially inflated due to defendants' purportedly misleading statements. The court believes that any defenses that may appear unique to Bohl are unlikely to detract from the focus of the litigation or become a detriment to the rest of the subclass members.

The court therefore cannot conclude that Bohl is subject to unique issues in this litigation sufficient to undermine the typicality requirement under Rule 23(a)(3). Thus, the court concludes that plaintiffs have satisfied the Rule 23(a)(3) prerequisite as to this subclass.

### 4.   Adequacy Requirement

In order to satisfy the adequacy requirement, plaintiffs must show that the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and that each representative's interests are sufficiently similar to those of the class so that it is unlikely that their goals and viewpoints will diverge.   See Parkhill, 188 F.R.D. at 339. Defendants challenge the adequacy of plaintiffs' class representatives contending that they have abdicated their responsibility for the direction of this litigation to their attorneys.   Defendants further allege that, since the commencement of this action, plaintiffs have altered their claims and allegations in an effort to "shoehorn" their case to fit certification.

### a.   10b-5 Subclass

Defendants assert that the proposed lead plaintiffs, Robert Graham, Joseph Pobuda and Lewis Bohl are inadequate representatives of the 10b-5 subclass.   Defendants specifically allege, in part, that: (1) Graham did not review the complaint prior to signing his certification, lacks detailed knowledge of the litigation and has failed to appropriately monitor his attorney's actions in this lawsuit; (2) Pobuda failed to research his attorneys before retaining them, misstated the dates of the class period and lacks credibility arising from his deposition testimony; and (3) Bohl

lacks a substantive understanding of the litigation, has not sufficiently reviewed the class action complaint, and was unaware of a settlement offer that had been extended by defendants.   In sum, defendants allege that these three plaintiff representatives have turned over the prosecution of this action to their attorneys and are therefore inadequate to serve as class representatives.

Plaintiffs respond that under Rule 23(a), the court need only consider whether plaintiffs' counsel is qualified to vigorously prosecute the interest of the class and whether plaintiffs' proposed class representatives have interests sufficiently common with the other members of the class.   See Paxton, 688 F.2d at 562-63; Biben v. Card, No. 84-0844-CV-W-6, 1986 WL 1199, at *6 (W.D. Mo. Jan. 6, 1986) ("The requirement of Rule 23(a)(4) ... has generally been recognized as imposing two related standards: (1) an absence of conflicts of interest between the named plaintiffs and the rest of the class members, and (2) an assurance of vigorous prosecution of the lawsuit ... [a]s for the latter test, courts will usually 'focus on the competence and experience of class counsel.'"(citing Newberg § 3.22)).

Plaintiffs assert that the three named plaintiffs are adequate representatives because they have interests in common with the rest of the members of the class since all bought stock based upon the alleged misrepresentations of defendants.   See id.   Plaintiffs also assert that the three named representatives are able to vigorously

prosecute this action through their employment of qualified legal

counsel. [13]  Plaintiffs accuse defendants of misquoting the proposed

class representatives' deposition testimony and over-arguing the

extent to which they are familiar with legal terminology or are

able to recall specific details of the litigation.

The court agrees with plaintiffs.  Class representatives in

complex cases are not required to have the detailed level of

firsthand knowledge of facts or law that defendants seek to impose.

See In re Workers' Comp. Ins. Antitrust Litig., 130 F.R.D. 99, 107–

108 (D. Minn. 1990); Harman v. LyphoMed, Inc., 122 F.R.D. 522, 528

(N.D. Ill. 1988) ("[i]n a complex securities case involving novel

economic and legal theories ... it is irrational to expect

plaintiffs to exhibit a detailed knowledge of the issue [such as

fraud on the market]."). The class representatives have

demonstrated a willingness to vigorously prosecute this action

through qualified counsel and appear sufficiently able to protect

and advance the interests of the entire subclass. [14]

_____

[13]  Defendants do not apparently challenge class counsel's
qualifications, experience or ability.  Defendants also do not
appear to argue that the proposed class representatives hold any
interests antagonistic to the class.  See In re Bulk Popcorn
Antitrust Litig., Civil No. 3-89-710, at 3 (D. Minn. Feb. 26, 1991)
(holding that where "[t]here are no conflicts of interest between
the plaintiffs and the class members, and the plaintiffs are
represented by qualified counsel[,] plaintiffs thereby satisfy the
adequate representation requirement set forth in Rule 23(a)(4).")

[14]  The court is also not convinced by the defendants' attack
on Pobuda's credibility.  As plaintiffs pointed out in their brief,
                                                   (continued...)

The court thus concludes that the proposed representatives will fairly and adequately represent the 10b-5 subclass.

### b.   IPO Subclass

Defendants assert that representative Dale is inadequate since she is purportedly not a member of the IPO subclass and because her behavior demonstrates a lack of diligence and competency. Regarding the first objection, the court has addressed this issue above and considers Dale to be a member of the subclass she seeks to represent.   Regarding the second objection, while the court agrees that Dale and her counsel should have determined the actual date of Dale's purchase of the stock at an earlier date, the court does not believe that this failing rises to a level of inadequacy which will preclude her from serving as a subclass representative.[15] Moreover, the court does not consider that any delay in identifying the purchase date is indicative of a lack of personal credibility or veracity on the part of Dale.   Accordingly, the court concludes that Dale is adequate to represent the IPO claims subclass.

_credibility_

---

[14] (...continued)
the record abundantly reflects that Pobuda was a careful and credible witness.   (See Pls.' Reply Mem. at 16-17.)   Moreover, as plaintiffs correctly point out, any inquiry into the credibility of a witness' deposition testimony is better left for another stage of the proceedings.   See Adobe Sys., 139 F.R.D. at 155, n. 10.

[15]   Additionally, as the court has already discussed, since paragraph 1 of Dale's complaint clearly reflects that her claims arise from the IPO that was approved by the SEC on December 3, 1998, the court does not believe that plaintiffs' original definition of the subclass precludes Dale from serving as the representative of the IPO subclass.

In sum, the court concludes that all of the named plaintiffs have demonstrated that they are adequate representatives who will fairly represent the interests of the other class members. Plaintiffs have met the adequacy requirements of Rule 23(a)(4). Having found that plaintiffs have satisfied the requirements of Rule 23(a), the court now addresses whether plaintiffs satisfy the requirements of Rule 23(b).

**B.   Rule 23(b) Analysis**

In addition to meeting the prerequisites of Rule 23(a), an action must also satisfy at least one of the three subdivisions of Rule 23(b).[16] For the following reasons, the court concludes that this action satisfies the requirement of Rule 23(b)(3), which states in pertinent part:

> (b)  Class Actions Maintainable.  An action may be maintained as a class action if the prerequisite of subdivision (a) are satisfied and, in addition: ... (3) the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**1.   Predominance**

There are no bright line rules to determine whether common questions predominate.  See Lockwood Motors Inc. v. Gen. Motors Corp., 162 F.R.D. 569, 579 (D. Minn. 1995).  Instead, a court must

---

[16] The court notes that defendants did not specifically contest the 23(b) prerequisites in their papers or at oral argument.

25

consider the facts of the case presented, and "a claim will meet
the predominance requirement when there exists generalized evidence
which proves or disproves an element on a simultaneous, class-wide
basis, since such proof obviates the need to examine each class
member's individual position."   Id.   Thus, a class action is
appropriate when common questions representing the significant
aspect of a case can be resolved in a single action.   In re
Workers' Comp., 130 F.R.D. at 108.  The common question need not be
dispositive of the entire action because "predominance" as used in
the rule is not automatically equated with "determinative."   Id.
See also Lockwood Motors, 162 F.R.D. at 580 ("[c]ommon questions
need only predominate; they need not be dispositive of the
litigation.").   As with the commonality and typicality
requirements, the predominance inquiry is directed toward the issue
of liability.   "When determining whether common questions
predominate, courts 'focus on the liability issue ... and if the
liability issue is common to the class, common questions are held
to predominate over individual questions'".   Genden v. Merrill
Lynch, Pierce, Fenner & Smith, Inc., 114 F.R.D. 48, 52 (S.D.N.Y.
1987) (quoting Dura-Bilt Corp. v. Chase Manhatten Corp., 89 F.R.D.
87, 93 (S.D.N.Y. 1981)).   See also Lockwood Motors, 162 F.R.D. at
580 ("'the fundamental question is whether the group aspiring to

class status is seeking to remedy a common legal grievance.'") (quoting 3B <u>Moore's Federal Practice</u> ¶ 23.45 at 23-306 through 23-307 (2d ed. 1995)).

Moreover, the mere fact that there are certain issues that may need to be determined on an individual basis does not necessarily preclude the satisfaction of the predominance requirement. <u>See</u> <u>Newberg</u> § 4.25 ("the very definition of the requirement of the predominance of common questions contemplates that individual issues will usually remain after the common issues are adjudicated"). For example, courts frequently grant class certification despite individual differences in class members' damages. <u>See</u> <u>Minnesota v. U.S. Steel Corp.</u>, 44 F.R.D. 559, 567 (D. Minn. 1968); <u>White v. NFL</u>, 822 F. Supp. 1389, 1403-04 (D. Minn. 1993). And in securities cases, courts often hold that under the "fraud on the market" theory, individual questions of reliance do not predominate over common questions. <u>See</u> <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 244-45 (1988); <u>Kaplan v. Rose</u>, 49 F.3d 1363, 1376 (9th Cir. 1994)("'[u]nder the fraud on the market theory, the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market.'") (quoting <u>In re Apple Computer Sec. Litig.</u>, 886 F.2d 1109, 1113-14 (9th Cir. 1989)).

Plaintiffs assert that the critical issues in this lawsuit involve defendants' liability for carrying out their common course of conduct in violation of federal securities laws to the detriment of lead plaintiffs and the other members of the class. Put differently, plaintiffs believe that there are common legal and factual questions arising from defendants' central course of conduct that predominate over the individual questions.[17] See In re Endotronics, Fed. Sec. L. Rep. (CCH) at 98,048 ("courts have ... found that common questions predominate 'when the alleged fraudulent representations constitute a common course of conduct.'") (citations omitted).

The court agrees that common questions predominate here since the alleged fraudulent representations that generated sales of the common stock constitute a common course of conduct. Accordingly, the court concludes that the predominance requirement of Rule 23(b)(3) has been satisfied.

## 2. Superiority

Rule 23(b) also requires that the class action be a superior means to adjudicate plaintiffs' claims. Fed. R. Civ. P. 23 (b).

---

[17] The predominate focus of this lawsuit, plaintiffs contend, will be on what defendants knew about the company's consumer credit agreement and when they knew it. (See Pls.' Mem. Supp. at 11.) In addition, plaintiffs assert that the defendants took steps to conceal information relating to the lender's desire and intent to terminate the customer lending agreement, thereby affirmatively misleading the market concerning the company's sales, market condition and growth prospects. (Id.)

28

This requirement is satisfied only after the court has examined and weighed the following four factors:  (1) the interest of members of the class in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).

In this case, plaintiffs assert that all factors weigh in favor of certifying this case to proceed as a class action.[18] Plaintiffs particularly assert that there is no indication that members of the class prefer to prosecute their claims individually and that it is unlikely that any of the plaintiffs would have the economic ability to do so since the complexity of these claims requires intensive legal preparation making individual lawsuits prohibitively expensive.  Plaintiffs thus assert that the class action "device" is not only the superior method for proceeding, but is effectively the only viable means of seeking redress for many of these claims.  The court agrees.

---

[18] The court also notes that defendants do not appear to seriously contest plaintiffs' assertion that the class action is superior to other methods for adjudicating this controversy.  See Nelson v. Craig Hallum, Inc., 659 F. Supp. 480, 489 (D. Minn. 1987).

In cases of this nature, the claims of individual investors are often too small to warrant separate lawsuits.  See In re Endotronics, Fed. Sec. L. Rep. at 98,048; Vernon J. Rockler & Co. v. Graphic Enter., Inc., 52 F.R.D. 335, 347 (D. Minn. 1971) ("'[a] class action must be deemed the only practical method of litigating ... when the complex nature of the litigation and the comparatively small individual financial interests are considered.'") (quoting Weiss v. Tenney Corp., 47 F.R.D. 283, 291 (S.D.N.Y. 1969)). Clearly, individual class members may not have the inclination or financial wherewithal to maintain a lawsuit of this complexity.

Finally, this case appears to present no unusual difficulties in management or notification of class members, and plaintiffs' counsel is experienced and has handled other similar actions. While this case appears complex, the court concludes that it presents no novel  or unique problems with respect to identifying class members or providing notice to them.  The court is also unaware of any competing putative class actions in any other jurisdictions arising from this matter.  Accordingly, the court believes that the superiority requirement of Rule 23(b)(3) is satisfied.

## CONCLUSION

For the reasons stated, the court concludes that plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23.

Accordingly, **IT IS HEREBY ORDERED**, that plaintiffs' motion for class certification is granted, and the court hereby:

1.  Conditionally certifies the following plaintiffs' class of:

> All persons and entities, other than defendants and their heirs, successors and assigns and the members of the individual defendants' immediate families, who: (i) purchased Select Comfort stock issued under and/or traceable to the company's registration statement/prospectus dated December 4, 1998 which was declared effective by the SEC on December 3, 1998 and filed in connection with Select Comfort's IPO; or (ii) purchased Select Comfort common stock in the open market during the period December 4, 1998 through June 7, 1999, and who were damaged by defendants' violations of the federal securities laws;

2.  Appoints lead plaintiff Heidi Dale as the Class Representative of Subclass (i) as defined above; and

3.  Appoints lead plaintiffs Louis Bohl, Robert Graham and Joseph C. Pobuda as Class Representatives for Subclass (ii) as defined above.

Dated: September 4 2001

_____
David S. Doty, Judge
United States District Court

# THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

IN RE: TRITON ENERGY LIMITED    §
                                   §       Civil Action No. 5-98-CV-256

SECURITIES LITIGATION           §       (Jury Trial Demanded)

## AFFIDAVIT OF JOHN TERRIL

STATE OF MISSOURI      :
                        : ss.

COUNTY OF ST. LOUIS    :

       I, John Terril, being duly sworn, states as follows:

1.      I am the President and founder of Terril Brothers, Inc. ("Terril Brothers"), a licensed investment advisor. Terril Brothers is one of the Lead Plaintiffs and one of the proposed class representatives in the above-referenced action..

2.      Terril Brothers purchased shares in Triton Energy Ltd. ("Triton") between March 30, 1998 and July 17, 1998 (the "Class Period"). Some of those shares were purchased for my own retirement account.

3.      I was the sole decision-maker with respect to Terril Brothers' investments in Triton securities.

4.      After purchasing those Triton shares, I allocated those shares to the accounts of several of my clients at Terril Brothers.



**EXHIBIT**

B

5.     I have spoken to each of my clients who had shares of Triton stock allocated to them during the Class Period and have advised them of the above-captioned litigation and Terril Brothers' role as a Lead Plaintiff and proposed class representative.

6.     Each of these clients have authorized me (through Terril Brothers) to act on their behalf with respect to this litigation and are not seeking to maintain actions against Triton other than through this litigation.

7.     If a recovery is achieved in this case either through judgment or a settlement, any monies shall be allocated to my clients as determined by the court and/or the claims administrative process.

_____
                                          JOHN TERRIL

Sworn to on this ___ day of
September 2001

_____
Notary Public

```
" NOTARY SEAL "
Erika Anderson Kuethe, Notary Public
St. Louis County, State of Missouri
My Commission Expires 8/18/2005
```

## CERTIFICATION OF PRESTON INGRAM
## IN SUPPORT OF CLASS ACTION COMPLAINT

Preston Ingram ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.   Plaintiff has reviewed the complaint captioned Richard Strauss, et al. v. Triton Energy, Limited, et al. (the "Action") prepared by counsel and filed in the Eastern District of Texas, Texarkana Division, and is willing to serve as a lead plaintiff in the Action on the basis of the allegations in that complaint or a substantively similar complaint or amended complaint to be filed.

2.   Plaintiff did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.   During the proposed Class Period, plaintiff executed transactions in the securities of Triton Energy Limited, as follows:  See Attached Schedule A.

5.   In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.   Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the

EXHIBIT
C

representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _13_ day of _August_, 1998.

Preston Ingram

## Schedule A
## Preston Ingram Transaction(s) in
## Triton Energy, Limited

**Purchase(s):**

| Date | Shares | Price |
|------|--------|-------|
| 6/2/98 | 5,000 | 37 3/16 |
| 6/2/98 | 5,000 | 37 1/8 |
| 6/26/98 | 100 Call Nov 35 | 3 3/4 |
| 6/29/98 | 1,000 | 32 1/2 |
| 6/29/98 | 4,000 | 32 1/2 |
| 7/13/98 | 2,000 | 33 5/16 |
| 7/13/98 | 1,000 | 33 5/16 |
| 7/14/98 | 10,000 | 31 13/16 |
| 7/14/98 | 1,000 | 34 1/16 |
| 7/14/98 | 2,000 | 34 1/16 |
| 7/14/98 | 2,000 | 34 1/16 |
| 7/17/98 | 10,000 | 22 1/8 |

**Sale(s):**

| Date | Shares | Price |
|------|--------|-------|

TEXARKANA DIVISION

IN RE: TRITON ENERGY LIMITED § 
§       Civil Action No. 5-98-CV-256
SECURITIES LITIGATION § (Jury Trial Demanded)

## LEAD PLAINTIFF PRESTON INGRAM RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Preston Ingram hereby responds to defendant's First Set of Interrogatories as follows:

## GENERAL RESPONSES

1. Plaintiff's response is made to the best of Plaintiff's present knowledge, information and belief. The investigation and discovery of Plaintiff's claims are ongoing, and consequently, the parties may learn additional facts presently unknown, or may locate additional documents presently unidentified, which may alter or invalidate or require the supplementation of this response. This response is at all times subject to such additional or different information that discovery or further investigation may disclose, and, while based on the present state of Plaintiff's recollection, is subject to such refreshing of recollection, and such additional knowledge of facts, as may result from further discovery or investigation.

2. No admission of any nature whatsoever is to be implied or inferred from Plaintiff's response. The fact that this response may contain answers or admissions to certain requests or questions should not be taken as an admission or concession of the existence of any facts set forth or assumed by such requests or questions, or that such response constitutes evidence of any such fact as set forth or assumed.

3.      Plaintiff reserves all objections or other questions as to the competency, relevance, materiality, privilege or admissibility as evidence in any subsequent proceeding or in trial of this or any other action for any purpose whatsoever of this response and any answer or document or thing identified or produced in response to the Propounding Parties' interrogatories.

4.      Plaintiff reserves the right to object on any ground at any time to such other or supplemental interrogatories as the Propounding Parties may at any time propound involving or relating to the subject matter of these interrogatories.

## GENERAL OBJECTIONS

Plaintiff makes the following general objections, whether or not separately set forth in response to each and every interrogatory, to each and every definition, and to each and every interrogatory propounded in Defendant's first set of interrogatories:

1.      Plaintiff objects to all interrogatories insofar as any such interrogatory seeks identification of documents or information protected by the attorney-client privilege and the attorney-client work product doctrine.  Such documents or information shall not be produced in response to the Propounding Parties' interrogatories, and any inadvertent production thereof shall not be deemed a waiver of any privilege with respect to such documents or information or of any work product which may attach thereto.

2.      Plaintiff objects to all interrogatories to the extent that they are unreasonably cumulative, duplicative and/or disproportionate subjecting Plaintiff to unreasonable and undue annoyance, oppression, burden, and expense.

3.      Plaintiff objects to all interrogatories to the extent  that they seek identification of all documents, all witnesses or all information in support of Plaintiff's claims at an early stage of

2

the litigation of this action subjecting Plaintiff to unreasonable and undue annoyance, oppression, burden, and expense.

4.    Plaintiff objects to the introductory definitions and instructions to the Propounding Parties' interrogatories to the extent said definitions or instructions purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific interrogatory on the ground that such enlargement, expansion, or alteration renders said interrogatory vague, ambiguous, unintelligible, unduly broad, and uncertain.

5.    Plaintiff objects to all instructions, definitions and interrogatories to the extent that they seek identification of documents or information not currently in Plaintiff's possession, custody or control, or refer to persons, entities or events not known to Plaintiff, on the grounds that such instructions, definitions, or interrogatories seek to require more of Plaintiff than any obligation imposed by law, would subject Plaintiff to unreasonable and undue annoyance, oppression, burden, and expense, and would seek to impose upon Plaintiff an obligation to investigate or discover information or material from third parties or sources who are equally accessible to the Propounding Parties.

6.    Plaintiff objects to all definitions, instructions, and interrogatories in which the phrases "refer to" or "relate to" appears.  The phrases "refer to" and "relate to" are overly broad, vague, ambiguous, and unintelligible, require subjective judgment on the part of Plaintiff and his attorneys, and would require a conclusion or opinion of counsel in violation of the attorney-client privilege and the attorney-client work product doctrine.  Without waiving this objection, and subject to all other applicable objections or privileges stated herein, Plaintiff will identify or produce, in response to any interrogatory call for the identification of documents that "relates to "

3

or "supports" a given subject, such documents as expressly reflect or refer on their face to information relevant to the specified subject.

7.    Plaintiff objects to all instructions, definitions and interrogatories to the extent they seek identification of documents or information on a continuing basis, on the ground that said instruction seeks unilaterally to impose an obligation to provide supplemental information greater than that required by the Federal Rules of Civil Procedure and would subject Plaintiff to unreasonable and undue annoyance, oppression, burden, and expense, all such instructions, definitions and interrogatories will not be regarded as continuing in nature.

8.    Plaintiff objects to all definitions, instructions, and interrogatories to the extent they seek to require Plaintiff to search for and identify documents or information no longer in existence or in its possession, custody or control, on the grounds that said instruction is overly broad, would subject Plaintiff to undue annoyance, oppression, burden, and expense, and seeks to impose upon Plaintiff an obligation to investigate information or materials from third parties or services who are equally accessible to the Propounding Parties.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, Plaintiff Preston Ingram responds to the specific interrogatories as follows:

## Interrogatory No. 1

State the name or designation of every brokerage account you maintained at any time from January 1, 1995 to the present with a broker or brokerage firm that deals in the sale or purchase of securities, including the name of the broker or brokerage firm, the name of the account holder(s) and the identification number of the account.

## Response to Interrogatory No. 1

Plaintiff objects to this request on the ground that the request is impermissibly over broad, and unduly burdensome constituting unwarranted annoyance, embarrassment or oppression. Plaintiff further objects on the grounds that this request seeks information that is protected from disclosure and is violative of Plaintiff's right of privacy. Plaintiff further objects on the grounds that this request seeks information that is beyond the scope of permissible discovery (not relevant to the subject matter or likely to lead to discovery of admissible evidence).

Notwithstanding the specific and general objections, Plaintiff has maintained accounts with the following brokers or brokerage firms dealing in the sale or purchase of securities since January 1, 1995:

1.  Charles Schwab & Co., Inc.
    Account Holder:  Henry Preston Ingram

2.  Montgomery Securities
    Account Holder:  Henry Preston Ingram

3.  Paine Webber
    Account Holder:  Henry Preston Ingram

4.  J.C. Bradford & Co.
    Account Holder:  Henry Preston Ingram

5.  Lazard
    Account Holder:  Henry Preston Ingram

## Interrogatory No. 2

Describe each acquisition by you of Triton securities within the past ten (10) years, including the date of each acquisition, the number of securities acquired, the amount paid for each security, the manner by which each acquisition was effected (e.g., purchased through a broker, dealer or other intermediary, received as a gift, etc.), and the name of the broker and/or brokerage firm used.

5

## Response to Interrogatory No. 2

Plaintiff objects to this request on the ground that the request is impermissibly compound, conjunctive and disjunctive constituting unwarranted annoyance, embarrassment or oppression. Plaintiff further objects on the ground that this request seeks information equally available to the Propounding Parties. Additionally, Plaintiffs object to this Interrogatory to the extent that it seeks information outside the scope of the relevant time period.

Notwithstanding the specific and general objections, Plaintiff responds to this request by designating Plaintiff's copies of the confirmations reflecting Plaintiff's purchases and sales of shares of Triton Energy, produced herewith as responsive to this Interrogatory pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

| 1. | a) | Date of Purchase: | March 10, 1998 |
| | b) | Number of shares acquired: | 10,000 |
| | c) | Amount paid: | $32.25 per share |
| | d) | Acquisition effected: | Unknown |
| | e) | Name of Brokerage Firm: | Unknown |

| 2. | a) | Date of Purchase: | March 12, 1998 |
| | b) | Number of shares acquired: | 10,000 |
| | c) | Amount paid: | $32.99 per share |
| | d) | Acquisition effected: | Unknown |
| | e) | Name of Brokerage Firm: | Unknown |

| 3. | a) | Date of Purchase: | June 2, 1998 |
| | b) | Number of shares acquired: | 5,000 |
| | c) | Amount paid: | $37 3/16 per share |
| | d) | Acquisition effected: | Through Brokerage Firm |
| | e) | Name of Brokerage Firm: | Charles Schwabb & Co., Inc. |

| 4. | a) | Date of Purchase: | June 2, 1998 |
| | b) | Number of shares acquired: | 5,000 |

6

|   |     |                           |                           |
|---|-----|---------------------------|---------------------------|
|   | c)  | Amount paid:              | $37 31/8 per share        |
|   | d)  | Acquisition effected:     | Through Brokerage Firm    |
|   | e)  | Name of Brokerage Firm:   | Charles Schwabb & Co., Inc. |

5. 
|     |                           |                           |
|-----|---------------------------|---------------------------|
| a)  | Date of Purchase:         | June 26, 1998             |
| b)  | Number of shares acquired: | 100 (Call Options)       |
| c)  | Amount paid:              | $3 3/4 per share          |
| d)  | Acquisition effected:     | Through Brokerage Firm    |
| e)  | Name of Brokerage Firm:   | Charles Schwabb & Co., Inc. |

6. 
|     |                           |                           |
|-----|---------------------------|---------------------------|
| a)  | Date of Purchase:         | June 29, 1998             |
| b)  | Number of shares acquired: | 1,000                    |
| c)  | Amount paid:              | $32 ½ per share           |
| d)  | Acquisition effected:     | Through Brokerage Firm    |
| e)  | Name of Brokerage Firm:   | Charles Schwabb & Co., Inc. |

7. 
|     |                           |                           |
|-----|---------------------------|---------------------------|
| a)  | Date of Purchase:         | June 29, 1998             |
| b)  | Number of shares acquired: | 4,000                    |
| c)  | Amount paid:              | $32 ½ per share           |
| d)  | Acquisition effected:     | Through Brokerage Firm    |
| e)  | Name of Brokerage Firm:   | Charles Schwabb & Co., Inc. |

8. 
|     |                           |                           |
|-----|---------------------------|---------------------------|
| a)  | Date of Purchase:         | July 13, 1998             |
| b)  | Number of shares acquired: | 2,000                    |
| c)  | Amount paid:              | $33 5/16 per share        |
| d)  | Acquisition effected:     | Through Brokerage Firm    |
| e)  | Name of Brokerage Firm:   | Charles Schwabb & Co., Inc. |

9. 
|     |                           |                           |
|-----|---------------------------|---------------------------|
| a)  | Date of Purchase:         | July 13, 1998             |
| b)  | Number of shares acquired: | 1,000                    |
| c)  | Amount paid:              | $33 5/16 per share        |
| d)  | Acquisition effected:     | Through Brokerage Firm    |
| e)  | Name of Brokerage Firm:   | Charles Schwabb & Co., Inc. |

10. 
|     |                           |                           |
|-----|---------------------------|---------------------------|
| a)  | Date of Purchase:         | July 14, 1998             |
| b)  | Number of shares acquired: | 10,000                   |
| c)  | Amount paid:              | $31 13/16 per share       |
| d)  | Acquisition effected:     | Through Brokerage Firm    |
| e)  | Name of Brokerage Firm:   | Charles Schwabb & Co., Inc. |

11. 
|     |                           |                           |
|-----|---------------------------|---------------------------|
| a)  | Date of Purchase:         | July 14, 1998             |
| b)  | Number of shares acquired: | 1,000                    |

7

|   | c) | Amount paid: | $34 1/16 per share |
|   | d) | Acquisition effected: | Through Brokerage Firm |
|   | e) | Name of Brokerage Firm: | Charles Schwabb & Co., Inc. |

| 12. | a) | Date of Purchase: | July 14, 1998 |
|   | b) | Number of shares acquired: | 2,000 |
|   | c) | Amount paid: | $34 1/16 per share |
|   | d) | Acquisition effected: | Through Brokerage Firm |
|   | e) | Name of Brokerage Firm: | Charles Schwabb & Co., Inc. |

| 13. | a) | Date of Purchase: | July 14, 1998 |
|   | b) | Number of shares acquired: | 2,000 |
|   | c) | Amount paid: | $34 1/16 per share |
|   | d) | Acquisition effected: | Through Brokerage Firm |
|   | e) | Name of Brokerage Firm: | Charles Schwabb & Co., Inc. |

| 14. | a) | Date of Purchase: | July 17, 1998 |
|   | b) | Number of shares acquired: | 10,000 |
|   | c) | Amount paid: | $22 1/8 per share |
|   | d) | Acquisition effected: | Through Brokerage Firm |
|   | e) | Name of Brokerage Firm: | Charles Schwabb & Co., Inc. |

| 15. | a) | Date of Purchase: | November 27, 1998 |
|   | b) | Number of shares acquired: | 430 (Put Options) |
|   | c) | Amount paid: | $11.00 per share |
|   | d) | Acquisition effected: | Unknown |
|   | e) | Name of Brokerage Firm: | Unknown |

| 16. | a) | Date of Purchase: | December 1, 1998 |
|   | b) | Number of shares acquired: | 43,000 |
|   | c) | Amount paid: | $11.08 per share |
|   | d) | Acquisition effected: | Unknown |
|   | e) | Name of Brokerage Firm: | Unknown |

## Interrogatory No. 3

Identify each document upon which you relied in making each acquisition of Triton securities described in your answer to Interrogatory No. 2.

## Response to Interrogatory No. 3

8

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome. Not withstanding the specific and general objections, Plaintiff responds as follows: Various local broadcasts and press releases.

## Interrogatory No. 4

Identify each communication upon which you relied in making each acquisition of Triton securities described in your answer to Interrogatory No. 2.

## Response to Interrogatory No. 4

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome and seeks information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he does not specifically recall at this time each communication, if any, upon which he relied in making each acquisition of Triton securities. Plaintiff does recall speaking to his friend Jim Philips regarding his purchases of Triton Energy securities.

## Interrogatory No. 5

Describe each disposition by you of Triton securities within the past ten (10) years, including the date of each disposition, the number of securities disposed of, the amount received for each security, the manner by which each disposition was effected (e.g., sold through a broker, dealer or other intermediary, given as a gift, etc.) and the name of the broker and /or brokerage firm used.

## Response to Interrogatory No. 5

Plaintiff objects to this request on the ground that the request is impermissibly compound, conjunctive and disjunctive constituting unwarranted annoyance, embarrassment or oppression. Plaintiff further objects on the ground that this request seeks information equally available to the Propounding Parties.  Additionally, Plaintiffs object to this Interrogatory to the extent that it seeks information outside the scope of the relevant time period.

Notwithstanding the specific and general objections, Plaintiff responds to this request by designating Plaintiff's copies of the confirmations reflecting Plaintiff's purchases and sales of shares of Triton Energy, produced herewith as responsive to this interrogatory pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

1. a) Date of Disposition:      February 26, 1998
   b) Number of disposed:       100 (Put Options)
   c) Amount received:          Unknown
   d) Acquisition effected:     Unknown
   e) Name of Brokerage Firm:   Unknown

2. a) Date of Disposition:      March 23, 1998
   b) Number of disposed:       20,000
   c) Amount received:          $35.21
   d) Acquisition effected:     Unknown
   e) Name of Brokerage Firm:   Unknown

3. a) Date of Disposition:      November 27, 1998
   b) Number of disposed:       430 (Call Options)
   c) Amount received:          $11.00
   d) Acquisition effected:     Unknown
   e) Name of Brokerage Firm:   Unknown

4. a) Date of Disposition:      January 4, 1999
   b) Number of disposed:       43,000 (Put Options Exercised)
   c) Amount received:          $11.00

10

d)   Acquisition effected:       Unknown
e)   Name of Brokerage Firm:     Unknown

## Interrogatory No. 6

Identify each document upon which you relied in making each disposition of Triton securities described in your answer to Interrogatory No. 5.

## Response to Interrogatory No. 6

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome. Notwithstanding the specific and general objections, Plaintiff responds as follows: Various local broadcasts and press releases.

## Interrogatory No. 7

Identify each communication upon which you relied in making each disposition of Triton securities described in your answer to Interrogatory No. 5.

## Response to Interrogatory No. 7

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome and seeks information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he does not specifically recall at this time each communication, if any, upon which he relied in making each disposition of Triton securities.  Plaintiff does recall speaking to his friend Jim Philips, from time-to-time, regarding his disposition of Triton Energy securities

## Interrogatory No. 8

Describe each acquisition at any time from January 1, 1995 to the present by a family member of yours of Triton securities, including the date of each acquisition, the number of securities acquired, the amount paid for each security, the manner by which each acquisition was

11

effected (e.g. purchased through a broker, dealer or other intermediary, received as a gift, etc.)
and the name of the broker and/or brokerage firm used.

## Response to Interrogatory No. 8

Plaintiff objects to this request on the grounds that it is over broad and unduly

burdensome and seeks information not relevant to the subject matter of this action or reasonably

calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by

stating that he is not aware of any acquisitions by a family member of Triton securities from

January 1, 1995 to the present.

## Interrogatory No. 9

Identify each document upon which a family member of yours relied in making each
acquisition of Triton securities described in the answer to Interrogatory No. 8.

## Response to Interrogatory No. 9

Plaintiff objects to this request on the grounds that it is over broad and unduly

burdensome and seeks information not relevant to the subject matter of this action or reasonably

calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by

stating that he is not aware of any acquisitions by a family member of Triton securities from

January 1, 1995 to the present.

## Interrogatory No. 10

Identify each communication upon which a family member of yours relied in making each
acquisition of Triton securities described in the answer to Interrogatory No. 8.

12

### Response to Interrogatory No. 10

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome and seeks information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he is not aware of any acquisitions by a family member of Triton securities from January 1, 1995 to the present.

### Interrogatory No. 11

Describe each disposition at any time from January 1, 1995 to the present by a family member of yours of Triton securities, including the date of each disposition, the number of securities disposed of, the amount received for each security, the manner by which each disposition was effected (e.g., sold through a broker, dealer or other intermediary, received as a gift, etc.) and the name of the broker and/or brokerage firm used.

### Response to Interrogatory No. 11

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome and seeks information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he is not aware of any dispositions by a family member of Triton securities from January 1, 1995 to the present.

### Interrogatory No. 12

Identify each document upon which a family member of yours relied in making each disposition of Triton securities described in the answer to Interrogatory No. 11.

### Response to Interrogatory No. 12

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome and seeks information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he is not aware of any dispositions by a family member of Triton securities from January 1, 1995 to the present.

### Interrogatory No. 13

Identify each communication upon which a family member of yours relied in making each disposition of Triton securities described in the answer to Interrogatory No. 11.

### Response to Interrogatory No. 13

Plaintiff objects to this request on the grounds that it is over broad and unduly burdensome and seeks information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he is not aware of any dispositions by a family member of Triton securities from January 1, 1995 to the present.

### Interrogatory No. 14

Identify and describe each and every communication you have had with any Defendant in this action from January 1, 1998 to the present.

14

### Response to Interrogatory No. 14

Plaintiff objects to this request on the ground that the request is impermissibly over broad, and unduly burdensome constituting unwarranted annoyance, embarrassment or oppression. Plaintiff further objects on the grounds that this request seeks information that is protected from disclosure and is violative of Plaintiff's right of privacy. Plaintiff further objects on the grounds that this request seeks information that is beyond the scope of permissible discovery (not relevant to the subject matter or likely to lead to discovery of admissible evidence).

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he does not recall any communications with any Defendant in this action from January 1, 1998 to the present.

### Interrogatory No. 15

Identify each and every agreement between or among you, any person who is a named plaintiff in this action (including any of the separate actions that were consolidated), any person who allegedly is a member of the putative class, and/or any attorney or law firm representing any plaintiff(s) in this action regarding the method by which the costs, expenses and/or attorneys' fees incurred in the prosecution of this lawsuit will be paid.

### Response to Interrogatory No. 15

Plaintiff objects to this request on the grounds that it is over broad, vague, harassing, unduly burdensome and vexatious. Plaintiff also objects to this request to the extent that it seeks (1) information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence; and (2) information protected by the attorney-client privilege or attorney work-product doctrine. Subject to and without waiving these objections,

Plaintiff will provide responsive, non-privileged information, and has already produced a copy of his retainer agreement with his attorneys in this action.

## Interrogatory No. 16

Identify each and every agreement between or among you, any person who is a named plaintiff in this action (including any of the separate actions that were consolidated), any person who allegedly is a member of the putative class, in which the agreement refers or relates to the prosecution of this lawsuit as a class action, including but not limited to the choice of counsel to represent any such person and the decision to file or join this lawsuit.

## Response to Interrogatory No. 16

Plaintiff objects to this request on the ground that the request is impermissibly over broad, and unduly burdensome constituting unwarranted annoyance, embarrassment or oppression. Plaintiff further objects on the grounds that this request seeks information that is protected from disclosure and is violative of Plaintiff's right of privacy. Plaintiff further objects on the grounds that this request seeks information that is beyond the scope of permissible discovery (not relevant to the subject matter or likely to lead to discovery of admissible evidence).

## Interrogatory No. 17

Identify (by title or style of the action, the forum in which it is or was pending, the docket number, the nature of the action, and the current status or final disposition) all lawsuits against publicly held corporations in the last ten (10) years to which you have been a party or participant, including all other class actions or putative class actions in which you were appointed or attempted to be appointed as a class representative.

## Response to Interrogatory No. 17

Plaintiff objects to this request on the grounds that it is over broad, harassing, unduly burdensome, vague ambiguous and seeks information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further

16

objects to this request to the extent that it seeks information protected by the attorney-client privilege or attorney work-product doctrine. Plaintiff also objects to this request to the extent that it seeks information beyond the scope of the relevant time period. Additionally, Plaintiff objects to this request to the extent that it seeks information concerning litigation(s), arbitration(s) or proceedings other than those in which Plaintiffs were representatives of a class of purchasers of securities. Subject to and without waiving these objections, Plaintiff will provide responsive information for the relevant time period for Plaintiff Preston Ingram to the extent he served as representative of a class of purchasers. Plaintiff Preston Ingram has not served as a representative of a class or purchasers of securities within the last ten (10) years.

### Interrogatory No. 18

State every occasion on which you or any of your family members have had any direct or indirect relationship or dealing(s) with Class Counsel, other than through this litigation, and identify each participant in the relationship or dealing(s), state the nature of the relationship or dealing(s), and state the date(s) upon which the relationship or dealing(s) began and/or terminated.

### Response to Interrogatory No. 18

Plaintiff objects to this request on the ground that the request is impermissibly over broad, and unduly burdensome constituting unwarranted annoyance, embarrassment or oppression. Plaintiff further objects on the grounds that this request seeks information that is protected from disclosure and is violative of Plaintiff's right of privacy. Plaintiff further objects on the grounds that this request seeks information that is beyond the scope of permissible discovery (not relevant to the subject matter or likely to lead to discovery of admissible evidence).

17

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that he does not recall having any direct or indirect relationship or dealings with Class Counsel, other than through this litigation. Further, Plaintiff is not aware of any family members who have had any direct or indirect relationship with Class Counsel.

### Interrogatory No. 19

Explain the method(s) by which you calculate the actual damages that you claim you allegedly sustained as a result of the alleged wrongdoing asserted in the Complaint, including the amount of actual damages that you seek to recover individually.

### Response to Interrogatory No. 19

Plaintiff objects to this request on the ground that the request is in violation of Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure and Plaintiff will designate a responsive testifying expert witness in compliance with the disclosure provisions in Rule 26(a)(2)(A) and (B) of the Federal Rules of Civil Procedure at the appropriate time as specified under Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that the misrepresentations and nondisclosures of the Defendant which are described in the complaint had the effect of artificially inflating the value of Triton common stock in relation to its true value at the times when Plaintiff and other members of the Class purchased such securities. Full discovery is necessary before Plaintiffs can fully quantify the amount of damages.

### Interrogatory No. 20

Explain the method(s) by which the actual damages that member of the putative class allegedly sustained as a result of the alleged wrongdoing asserted in the Complaint, including the amount of actual damages that you seek to recover on behalf of the class.

## Response to Interrogatory No. 20

Plaintiff objects to this request on the ground that the request is in violation of Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure and Plaintiff will designate a responsive testifying expert witness in compliance with the disclosure provisions in Rule 26(a)(2)(A) and (B) of the Federal Rules of Civil Procedure at the appropriate time as specified under Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure.

Notwithstanding the specific and general objections, Plaintiff responds to this request by stating that the misrepresentations and nondisclosures of the Defendant which are described in the complaint had the effect of artificially inflating the value of Triton common stock in relation to its true value at the times when Plaintiff and other members of the Class purchased such securities. Full discovery is necessary before Plaintiffs can fully quantify the amount of damages.

## Interrogatory No. 21

If you have retained or consulted with any witness who may be called upon to provide expert testimony (whether by live testimony, deposition testimony or affidavit) relating to any issues in this litigation, including but not limited to, your Motion for Class Certification, please identify the expert, explain the subject matter upon which the expert has been asked to consider or investigate and upon which the expert is expected to testify, the facts made known to the expert, and the mental impressions and/or opinions held or to be rendered by the expert.

## Response to Interrogatory No. 21

19

Plaintiff objects to this request on the grounds that it is over broad, unduly burdensome and premature. Plaintiffs also object to this request to the extent that it seeks (1) information not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence and (2) information protected by the attorney-client privilege, attorney work-product doctrine or Rule 26(b)(3) of the Federal Rules of Civil Procedure relating to trial preparation materials. Subject to and without waiving these objections, plaintiffs will respond in a reasonable and timely manner pursuant to Rule 26(a)(2) and the Court's Order governing this litigation.

## Interrogatory No. 22

With respect to the putative class, state all criteria that you propose to use in determining whether a person is a member of the putative class.

## Response to Interrogatory No. 22

The putative class consists of all persons who purchased on the open market the common stock of Defendant between March 30, 1998 and July 17, 1998.

Dated: August 2, 2001

Preston Ingram

*LAW OFFICES OF YOUNG & PICKETT*

By: _____

Damon Young
State Bar No. 22176700
Lance Lee
State Bar No. 24004762
4122 Texas Blvd. – P.O. Box 1897
Texarkana, Texas 75503
(903) 794-1303 Telephone
(903) 794-5098 Facsimile

**PLAINTIFFS LIAISON COUNSEL**

*MILBERG WEISS BERSHAD
HYNES & LERACH, L.L.P.*
Steven G. Schulman
Keith M. Fleischman
U. Seth Ottensoser
One Pennsylvania Plaza
New York, New York 10119-0165

Plaintiffs' Co-Lead Counsel

*NIX, PATTERSON & ROACH, L.L.P.*
Cary Patterson
Jeffrey J. Angelovich
Bradley E. Beckworth
205 Linda Drive-P.O. box 679
Daingerfield, Texas 75638

Plaintiffs' Co-Lead Counsel

*PATTON, HALTOM, ROBERTS,
MCWILLIAMS & GREER*
George L. McWilliams
Richard A. Adams
2900 St. Michaels Drive, Suite 400
Century Bank Plaza
Texarkana, Texas 75503

21

***STULL, STULL & BRODY***
Jules Brody
6 East 45th Street
New York, New York 10017

***WEISS & YOURMAN***
Joseph H. Weiss
551 Fifth Avenue
New York, New York 10176

***ABBEY, GARDY & SQUITIERI, LLP***
Mark C. Gardy
Joshua N. Rubin
212 East 39th Street
New York, New York 10016

***POMERANTZ HAUDEK BLOCK***
***& GROSSMAN***
Stanley M. Grossman
100 Park Avenue
New York, New York 10017-5516

***WOLF HALDENSTEIN ADLER***
***FREEMAN & HERZ***
Daniel W. Krasner
270 Madison Avenue
New York, New York 10016

***LAW OFFICE OF KLARI NEUWELT***
Klari Neuwelt
110 East 59th Street-29th Floor
New York, New York 10022

***BARRACK, RODOS & BACINE***
Daniel E. Bacine
Samuel R. Simon
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103

nuary 1999

Account Number KL 10129 20
Your Investment Executive
PHILLIPS, WILLIAM
615 251-0800

Page 2 of 3

# PaineWebber
## Investment Account

PPCL07379I

## set portfolio

*n available, prices, income and current values may be approximate and thus gains/losses may not be accurately reflected. Details on back of page one. An asterisk (**) indicates a change in the original transaction data from rior month or the display of new date input at your branch office. Gains/losses are not calculated for zero coupon investments.*

### titles

### mmon stock

| shares | Description | Price | Current value | Est. annual income | Trade date | Shares purchased | Purchase price | Cost basis | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 50,000 | PRISON REALTY CORP | 20.500 | 1,025,000.00 | 96,000 | 01/22/99 | 50,000.000 | 19.975 | 1,001,000 | |
| | Total | $ | 1,025,000.00 | 96,000 | | | | 1,001,000 | |

## onthly activity

### sh flow

| Activity | Description | Amount | Date | Activity | Description | Price / Value | Amount |
|---|---|---|---|---|---|---|---|
| I1 | Balance forward | $ 7,496.40 | | | Proceeds from security transactions | | $ 1,527,950.00 |
| I7 WITHDRAWAL | FEDERAL FUNDS | -1,535,446.00 | | | Funds used for security transactions | | $ -1,001,000.00 |
| I7 FEE CHARGE | FED FUND WIRE TRANSFER FEE | -25.00 | 01/29 | | Closing balance | | $ |
| I8 TRANSFER | MISCELLANEOUS ADJUSTMENT | 25.00 | | | | | |
| I8 DEPOSIT | FEDERAL FUNDS DEPOSITED | 1,001,000.00 | | | | | |

### curity transactions

| Activity | Description | Quantity | Price / Value | Amount |
|---|---|---|---|---|
| I4 SOLD | FIRST DATA CORP CALL ASSIGNMENTS | -31,600.000 | 27 15/16 | $ 882,925.00 |
| I4 SOLD | PHYCOR INC CALL ASSIGNMENTS | -27,000.000 | 6 3/8 | 172,125.00 |
| I4 SOLD | TRITON ENERGY LTD PUT EXERCISE | -43,000.000 | 11 | 473,000.00 |
| I7 BOUGHT | PRISON REALTY CORP UNSOL | 50,000.000 | 19.975000 | 1,001,000.00 |
| | Securities purchased | | $ | 1,001,000.00 |
| | Securities sold | | $ | 1,527,950.00 |



EXHIBIT

D

*January 1999*

PAINEWEBBER INC.
SUITE 2300
511 UNION STREET
NASHVILLE, TN 37219-1755
PPCLD73787-X6   - 0189 - KL - D

Page   1 of   3

Net account value on December 31     $   1,540,031.00 *
Net account value on January 29      $   1,025,000.00 *
* Excludes unpriced assets.   See back for details.

## PaineWebber
## Investment Account

Account Number  KL 10129 20

**Your Investment Executive**
PHILLIPS, WILLIAM          615 251-0600

CROSSFIRE FUND LLC
FA MASTER ACCT
8440 CROCKETT LANE
COLLEGE GROVE      TN 37046-9103

**Account Instructions**
Statement copies are sent to 1 interested party.

**Bulletin Board**
IF YOU HAVE EARNED INCOME, DON'T WAIT UNTIL
APRIL 15 TO PUT YOUR IRA CONTRIBUTIONS TO
WORK. MAKE YOUR 1998 & 1999 CONTRIBUTIONS NOW
TO MAXIMIZE POTENTIAL TAX-ADVANTAGED GROWTH

## activity highlights

| | Current period | | Year-to-date |
|---|---|---|---|
| deposits | $ 1,001,025.00 | $ | 1,001,025.00 |
| Withdrawals | -1,535,446.00 | | -1,535,446.00 |
| Miscellaneous charges and adjustments | -25.00 | | -25.00 |
| Net change from cash flow | $ -534,446.00 | $ | -534,446.00 |

## asset summary
e back of page one for information on assets excluded from this summary.

| | % of portfolio | Value |
|---|---|---|
| quities | 100.00 | 1,025,000.00 |
| et account value | | $ 1,025,000.00 |

## investment objectives
vestment objectives describe the overall goals you have for this account.  PaineWebber is introducing new investment objectives
ich include a return objective and a primary and, if applicable, secondary risk profile.  A description of the alternatives is included
the reverse side of page one of this statement.  Please contact your Investment Executive or the Branch Manager at your branch
ce to update your account objectives.

| Growth | 2 Speculation | 3. | 4. |
|---|---|---|---|